# ATLANTIC RICHFIELD CO. *v.* USA PETROLEUM CO.

No. 88–1668.   Argued December 5, 1989—Decided May 14, 1990

BRENNAN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and MARSHALL, BLACKMUN, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 346.

Ronald C. Redcay argued the cause for petitioner. With him on the briefs were Matthew T. Heartney, Otis Pratt Pearsall, Philip H. Curtis, Francis X. McCormack, Donald A. Bright, and Edward E. Clark.

John G. Roberts, Jr., argued the cause for the United States et al. as amici curiae urging reversal. With him on the brief were Solicitor General Starr, Acting Assistant Attorney General Boudin, Deputy Solicitor General Shapiro, Michael R. Dreeben, Catherine G. O'Sullivan, and Kevin J. Arquit.

Maxwell M. Blecher argued the cause for respondent. With him on the brief were Alicia G. Rosenberg and Lawrence A. Sullivan.*

---

*Daniel K. Mayers, David Westin, and W. Terry Maguire filed a brief for the American Newspaper Publishers Association as amicus curiae urging reversal.

Briefs of amici curiae urging affirmance were filed for the State of California et al. by John K. Van de Kamp, Attorney General of California, Andrea S. Ordin, Chief Assistant Attorney General, Sanford N. Gruskin, Assistant Attorney General, and Thomas P. Dove and Richard N. Light, Deputy Attorneys General, Douglas B. Baily, Attorney General of Alaska, and Richard D. Monkman, Assistant Attorney General, Warren Price III, Attorney General of Hawaii, Thomas J. Miller, Attorney General of Iowa, and Gordan E. Allen, Deputy Attorney General, William J. Guste, Jr., Attorney General of Louisiana, and Anne F. Benoit, Assistant Attorney General, Robert M. Spire, Attorney General of Nebraska, and Dale A. Comer, Assistant Attorney General, Brian McKay, Attorney General of Nevada, and J. Kenneth Creighton, Deputy Attorney General, Dave Frohnmayer, Attorney General of Oregon, Ernest D. Preate, Jr., Attorney General of Pennsylvania, Eugene F. Wayne, Chief Deputy Attorney General, and Carl S. Hisiro, Senior Deputy Attorney General, Charles W. Burson, Attorney General of Tennessee, and Terry Craft, Deputy Attorney General, R. Paul Van Dam, Attorney General of Utah, and Arthur M. Strong, Assistant Attorney General; for the Service Station Dealers of America by Dimitri G. Daskalopoulos; and for the Society of Independent Gasoline Marketers of America by William W. Scott and Christopher J. MacAvoy.

JUSTICE BRENNAN delivered the opinion of the Court.

This case presents the question whether a firm incurs an "injury" within the meaning of the antitrust laws when it loses sales to a competitor charging nonpredatory prices pursuant to a vertical, maximum-price-fixing scheme. We hold that such a firm does not suffer an "antitrust injury" and that it therefore cannot bring suit under § 4 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 15.[1]

I

Respondent USA Petroleum Company (USA) sued petitioner Atlantic Richfield Company (ARCO) in the United States District Court for the Central District of California, alleging the existence of a vertical, maximum-price-fixing agreement prohibited by § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, an attempt to monopolize the local retail gasoline sales market in violation of § 2 of the Sherman Act, 15 U. S. C. § 2, and other misconduct not relevant here. Petitioner ARCO is an integrated oil company that, *inter alia*, markets gasoline in the Western United States. It sells gasoline to consumers both directly through its own stations and indirectly through ARCO-brand dealers. Respondent USA is an independent retail marketer of gasoline which, like other independents, buys gasoline from major petroleum companies for resale under its own brand name. Respondent competes directly with ARCO dealers at the retail level. Respondent's outlets typically are low-overhead, high-volume "discount" stations that charge less than stations selling equivalent quality gasoline under major brand names.

In early 1982, petitioner ARCO adopted a new marketing strategy in order to compete more effectively with discount

---

[1] Section 4 of the Clayton Act is a remedial provision that makes available treble damages to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."

independents such as respondent.[2]   Petitioner encouraged its dealers to match the retail gasoline prices offered by independents in various ways; petitioner made available to its dealers and distributors such short-term discounts as "temporary competitive allowances" and "temporary volume allowances," and it reduced its dealers' costs by, for example, eliminating credit card sales.   ARCO's strategy increased its sales and market share.

In its amended complaint, respondent USA charged that ARCO engaged in "direct head-to-head competition with discounters" and "drastically lowered its prices and in other ways sought to appeal to price-conscious consumers."   First Amended Complaint ¶19, App. 15.   Respondent asserted that petitioner conspired with retail service stations selling ARCO brand gasoline to fix prices at below-market levels: "Arco and its co-conspirators have organized a resale price maintenance scheme, as a direct result of which competition that would otherwise exist among Arco-branded dealers has been eliminated by agreement, and the retail price of Arco-branded gasoline has been fixed, stabilized and maintained at artificially low and uncompetitive levels."   ¶27, App. 17. Respondent alleged that petitioner "has solicited its dealers and distributors to participate or acquiesce in the conspiracy and has used threats, intimidation and coercion to secure compliance with its terms."   ¶37, App. 19.   According to respondent, this conspiracy drove many independent gasoline dealers in California out of business.   ¶39, App. 20.   Count one of the amended complaint charged that petitioner's vertical, maximum-price-fixing scheme constituted an agreement in restraint of trade and thus violated §1 of the Sherman Act. Count two, later withdrawn with prejudice by respondent,

---

[2] Because the case comes to us on review of summary judgment, " 'inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.' "   *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 587 (1986) (quoting *United States* v. *Diebold, Inc.*, 369 U. S. 654, 655 (1962)).

asserted that petitioner had engaged in an attempt to monopolize the retail gasoline market through predatory pricing in violation of § 2 of the Sherman Act.[3]

The District Court granted summary judgment for ARCO on the § 1 claim. The court stated that "[e]ven assuming that [respondent USA] can establish a vertical conspiracy to maintain low prices, [respondent] cannot satisfy the 'antitrust injury' requirement of Clayton Act § 4, without showing such prices to be predatory." App. to Pet. for Cert. 3b. The court then concluded that respondent could make no such showing of predatory pricing because, given petitioner's market share and the ease of entry into the market, petitioner was in no position to exercise market power.

A divided panel of the Court of Appeals for the Ninth Circuit reversed. 859 F. 2d 687 (1988). Acknowledging that its decision was in conflict with the approach of the Court of Appeals for the Seventh Circuit in several recent cases,[4] see id., at 697, n. 15, the Ninth Circuit nonetheless held that injuries resulting from vertical, nonpredatory, maximum-price-fixing agreements could constitute "antitrust injury" for purposes of a private suit under § 4 of the Clayton Act. The court reasoned that any form of price fixing contravenes Congress' intent that "market forces alone determine what goods and services are offered, at what price these goods and serv-

---

[3] The District Court granted petitioner's motion to dismiss the § 2 claim as originally pleaded. 577 F. Supp. 1296, 1304 (1983). Respondent subsequently amended its § 2 claim, but shortly after petitioner filed for summary judgment, respondent voluntarily dismissed that claim with prejudice. See App. 76–78. The Court of Appeals framed the issue as "whether a competitor's injuries resulting from vertical, *non-predatory*, maximum price fixing fall within the category of 'antitrust injury.'" 859 F. 2d 687, 689 (CA9 1988) (emphasis added). For purposes of this case we likewise assume that petitioner's pricing was not predatory in nature.

[4] See *Indiana Grocery, Inc.* v. *Super Valu Stores, Inc.*, 864 F. 2d 1409, 1418–1420 (1989); *Local Beauty Supply, Inc.* v. *Lamaur, Inc.*, 787 F. 2d 1197, 1201–1203 (1986); *Jack Walters & Sons Corp.* v. *Morton Bldg., Inc.*, 737 F. 2d 698, 708–709, cert. denied, 469 U. S. 1018 (1984).

ices are sold, and whether particular sellers succeed or fail."
*Id.*, at 693. The court believed that the key inquiry in deter-
mining whether respondent suffered an "antitrust injury"
was whether its losses "resulted from a disruption . . . in the
. . . market caused by the . . . antitrust violation." *Ibid.*
The court concluded that "[i]n the present case, the inquiry
seems straightforward: USA's claimed injuries were the di-
rect result, and indeed, under the allegations we accept as
true, the intended objective, of ARCO's price-fixing scheme.
According to USA, the purpose of ARCO's price-fixing is to
disrupt the market of retail gasoline sales, and that disrup-
tion is the source of USA's injuries." *Ibid.*

We granted certiorari, 490 U. S. 1097 (1989).

## II

A private plaintiff may not recover damages under § 4 of
the Clayton Act merely by showing "injury causally linked to
an illegal presence in the market." *Brunswick Corp.* v.
*Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 489 (1977). In-
stead, a plaintiff must prove the existence of *"antitrust* in-
jury, which is to say injury of the type the antitrust laws
were intended to prevent and that flows from that which
makes defendants' acts unlawful." *Ibid.* (emphasis in origi-
nal). In *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479
U. S. 104 (1986), we reaffirmed that injury, although causally
related to an antitrust violation, nevertheless will not qualify
as "antitrust injury" unless it is attributable to an anti-
competitive aspect of the practice under scrutiny, "since '[i]t
is inimical to [the antitrust] laws to award damages' for losses
stemming from continued competition." *Id.*, at 109–110
(quoting *Brunswick, supra*, at 488). See also *Associated
General Contractors of California, Inc.* v. *Carpenters*, 459
U. S. 519, 539–540 (1983); *Blue Shield of Virginia* v.
*McCready*, 457 U. S. 465, 483, and n. 19 (1982); *J. Truett
Payne Co.* v. *Chrysler Motors Corp.*, 451 U. S. 557, 562
(1981).

Respondent argues that, as a competitor, it can show antitrust injury from a vertical conspiracy to fix maximum prices that is unlawful under § 1 of the Sherman Act, even if the prices were set above predatory levels. In addition, respondent maintains that any loss flowing from a *per se* violation of § 1 automatically satisfies the antitrust injury requirement. We reject both contentions and hold that respondent has failed to meet the antitrust injury test in this case. We therefore reverse the judgment of the Court of Appeals.

## A

In *Albrecht* v. *Herald Co.*, 390 U. S. 145 (1968), we found that a vertical, maximum-price-fixing scheme was unlawful *per se* under § 1 of the Sherman Act because it threatened to inhibit vigorous competition by the dealers bound by it and because it threatened to become a minimum-price-fixing scheme.[5] That case concerned a newspaper distributor who sought to charge his customers more than the suggested retail price advertised by the publisher. After the publisher attempted to discipline the distributor by hiring another carrier to take away some of the distributor's customers, the distributor brought suit under § 1. The Court found that "the combination formed by the [publisher] in this case to force [the distributor] to maintain a specified price for the resale of newspapers which he had purchased from [the publisher] constituted, without more, an illegal restraint of trade under § 1 of the Sherman Act." *Id.*, at 153.

In holding such a maximum-price vertical agreement illegal, we analyzed the manner in which it might restrain competition by dealers. First, we noted that such a scheme, "by substituting the perhaps erroneous judgment of a seller for the forces of the competitive market, may severely intrude upon the ability of buyers to compete and survive in that market." *Id.*, at 152. We further explained that "[m]axi-

---

[5] We assume, *arguendo*, that *Albrecht* correctly held that vertical, maximum price fixing is subject to the *per se* rule.

mum prices may be fixed too low for the dealer to furnish services essential to the value which goods have for the consumer or to furnish services and conveniences which consumers desire and for which they are willing to pay." *Id.*, at 152–153. By limiting the ability of small dealers to engage in nonprice competition, a maximum-price-fixing agreement might "channel distribution through a few large or specifically advantaged dealers." *Id.*, at 153. Finally, we observed that "if the actual price charged under a maximum price scheme is nearly always the fixed maximum price, which is increasingly likely as the maximum price approaches the actual cost of the dealer, the scheme tends to acquire all the attributes of an arrangement fixing minimum prices." *Ibid.*

Respondent alleges that it has suffered losses as a result of competition with firms following a vertical, maximum-price-fixing agreement. But in *Albrecht* we held such an agreement *per se* unlawful because of its potential effects on dealers and consumers, not because of its effect on *competitors.* Respondent's asserted injury as a competitor does not resemble any of the potential dangers described in *Albrecht.*[6] For example, if a vertical agreement fixes "[m]aximum prices . . . too low for the dealer to furnish services" desired by consumers, or in such a way as to channel business to large distributors, *id.*, at 152–153, then a firm dealing in a competing brand would not be harmed. Respondent was *benefited* rather than harmed if petitioner's pricing policies restricted ARCO

---

[6] *Albrecht* is the only case in which the Court has confronted an unadulterated vertical, maximum-price-fixing arrangement. In *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211, 213 (1951), we also suggested that such an arrangement was illegal because it restricted vigorous competition among dealers. The restraint in *Kiefer-Stewart* had an additional horizontal component, however, see *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 348, n. 18 (1982), since the agreement was between two suppliers that had agreed to sell liquor only to wholesalers adhering to "maximum prices above which the wholesalers could not resell." *Kiefer-Stewart, supra*, at 212.

sales to a few large dealers or prevented petitioner's dealers from offering services desired by consumers such as credit card sales. Even if the maximum-price agreement ultimately had acquired all of the attributes of a minimum-price-fixing scheme, respondent still would not have suffered antitrust injury because higher ARCO prices would have worked to USA's advantage. A competitor "may not complain of conspiracies that . . . set minimum prices at *any* level." *Matsushita Electric Industrial Corp.* v. *Zenith Radio Corp.*, 475 U. S. 574, 585, n. 8 (1986); see also *id.*, at 582–583 ("[R]espondents [cannot] recover damages for any conspiracy by petitioners to charge higher than competitive prices in the . . . market. Such conduct would indeed violate the Sherman Act, but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price . . ."). Indeed, the gravamen of respondent's complaint—that the price-fixing scheme between petitioner and its dealers enabled those dealers to increase their sales—amounts to an assertion that the dangers with which we were concerned in *Albrecht* have *not* materialized in the instant case. In sum, respondent has not suffered "*antitrust* injury," since its losses do not flow from the aspects of vertical, maximum price fixing that render it illegal.

Respondent argues that even if it was not harmed by any of the anticompetitive effects identified in *Albrecht,* it nonetheless suffered antitrust injury because of the low prices produced by the vertical restraint. We disagree. When a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an "anticompetitive" consequence of the claimed violation.[7] A firm

---

[7] The Court of Appeals implied that the antitrust injury requirement could be satisfied by a showing that the "long-term" effect of the maximum-price agreements could be to eliminate retailers and ultimately to reduce competition. 859 F. 2d, at 694, 696. We disagree. Rivals cannot be excluded in the long run by a *nonpredatory maximum-price scheme unless*

complaining about the harm it suffers from nonpredatory price competition "is really claiming that it [is] unable to raise prices." Blair & Harrison, Rethinking Antitrust Injury, 42 Vand. L. Rev. 1539, 1554 (1989). This is not *antitrust* injury; indeed, "cutting prices in order to increase business often is the very essence of competition." *Matsushita, supra,* at 594. The antitrust laws were enacted for "the protection of *competition,* not *competitors." Brown Shoe Co.* v. *United States,* 370 U. S. 294, 320 (1962) (emphasis in original). "To hold that the antitrust laws protect competitors from the loss of profits due to [nonpredatory] price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share." *Cargill,* 479 U. S., at 116.

Respondent further argues that it is inappropriate to require a showing of predatory pricing before antitrust injury can be established when the asserted antitrust violation is an agreement in restraint of trade illegal under § 1 of the Sherman Act, rather than an attempt to monopolize prohibited by § 2. Respondent notes that the two sections of the Act are quite different. Price fixing violates § 1, for example, even if a single firm's decision to price at the same level would not create § 2 liability. See generally *Copperweld Corp.* v. *Independence Tube Corp.,* 467 U. S. 752, 767–769 (1984). In a § 1 case, the price agreement itself is illegal, and respondent contends that all losses flowing from such an agreement must by definition constitute "antitrust injuries." Respondent observes that § 1 in general and the *per se* rule in particular are grounded " 'on faith in price competition as a market force

---

they are relatively inefficient. Even if that were false, however, a firm cannot claim antitrust injury from nonpredatory price competition on the asserted ground that it is "ruinous." Cf. *United States* v. *Topco Associates, Inc.,* 405 U. S. 596, 610–612 (1972); *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 220–221 (1940). "[T]he statutory policy precludes inquiry into the question whether competition is good or bad." *National Society of Professional Engineers* v. *United States,* 435 U. S. 679, 695 (1978).

[and not] on a policy of low selling prices at the price of eliminating competition.'" *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 348 (1982) (quoting Rahl, Price Competition and the Price Fixing Rule—Preface and Perspective, 57 Nw. U. L. Rev. 137, 142 (1962)). In sum, respondent maintains that it has suffered antitrust injury even if petitioner's pricing was not predatory under §2 of the Sherman Act.

We reject respondent's argument. Although a vertical, maximum-price-fixing agreement is unlawful under §1 of the Sherman Act, it does not cause a competitor antitrust injury unless it results in predatory pricing.[8] Antitrust injury does not arise for purposes of §4 of the Clayton Act, see n. 1, *supra*, until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct, see *Brunswick*, 429 U. S., at 487; in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect.[9] See Areeda & Turner, Predatory Pricing and Related

---

[8] The Court of Appeals erred by reasoning that respondent satisfied the antitrust injury requirement by alleging that "[t]he removal of some elements of price competition distorts the markets, and harms all the participants." 859 F. 2d, at 694. Every antitrust violation can be assumed to "disrupt" or "distort" competition. "[O]therwise, there would be no violation." P. Areeda & H. Hovenkamp, Antitrust Law ¶ 340.3b, p. 411 (1989 Supp.). Respondent's theory would equate injury in fact with antitrust injury. We declined to adopt such an approach in *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477 (1977), and *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U. S. 104 (1986), and we reject it again today. The antitrust injury requirement cannot be met by broad allegations of harm to the "market" as an abstract entity. Although all antitrust violations, under both the *per se* rule and rule-of-reason analysis, "distort" the market, not every loss stemming from a violation counts as antitrust injury.

[9] This is not to deny that a vertical price-fixing scheme may facilitate predatory pricing. A supplier, for example, can reduce its prices to its own downstream dealers and share the losses with them, while forcing competing dealers to bear by themselves the full loss imposed by the lower prices. Cf. *FTC* v. *Sun Oil Co.*, 371 U. S. 505, 522 (1963). But because a firm always is able to challenge directly a rival's pricing as predatory, there is no reason to dispense with the antitrust injury requirement in an action by a competitor against a vertical agreement.

Practices Under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697, 697–699 (1975); McGee, Predatory Pricing Revisited, 23 J. Law & Econ. 289, 292–294 (1980). Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.

We have adhered to this principle regardless of the type of antitrust claim involved. In *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, for example, we found that a plaintiff competitor had not shown antitrust injury and thus could not challenge a merger that was assumed to be illegal under § 7 of the Clayton Act, even though the merged company threatened to engage in vigorous price competition that would reduce the plaintiff's profits. We observed that nonpredatory price competition for increased market share, as reflected by prices that are below "market price" or even below the costs of a firm's rivals, "is not activity forbidden by the antitrust laws." 479 U. S., at 116. Because the prices charged were not predatory, we found no antitrust injury. Similarly, we determined that antitrust injury was absent in *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, *supra*, even though the plaintiffs alleged that an illegal acquisition threatened to bring a "'deep pocket' parent into a market of 'pygmies,'" *id.*, at 487, a scenario that would cause the plaintiffs economic harm. We opined nevertheless that "if [the plaintiffs] were injured, it was not 'by reason of anything forbidden in the antitrust laws': while [the plaintiffs'] loss occurred 'by reason of' the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisitions unlawful." *Id.*, at 488. To be sure, the source of the price competition in the instant case was an agreement allegedly unlawful under § 1 of the Sherman Act rather than a merger in violation of § 7 of the Clayton Act. But that difference is not salient. When prices are not predatory, any losses flowing from them cannot be said to stem from an *anticompetitive* aspect of the de-

fendant's conduct.[10]    "'It is in the interest of competition to
permit dominant firms to engage in vigorous competition, in-
cluding price competition.'"    *Cargill*, 479 U. S., at 116 (quot-
ing *Arthur S. Langenderfer, Inc.* v. *S. E. Johnson Co.*, 729
F. 2d 1050, 1057 (CA6), cert. denied, 469 U. S. 1036 (1984)).[11]

## B

We also reject respondent's suggestion that no antitrust in-
jury need be shown where a *per se* violation is involved.    The

---

[10] We did not reach a contrary conclusion in *Matsushita Electric Indus-
trial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574 (1986), where we declined to
define precisely the term "predatory pricing" but stated instead that "[f]or
purposes of this case it is enough to note that respondents have not suf-
fered an antitrust injury unless petitioners conspired to drive respondents
out of the relevant markets by (i) pricing below the level necessary to sell
their products, or (ii) pricing below some appropriate measure of cost."
*Id.*, at 585, n. 8.    This statement does not imply that losses from *non*pred-
atory pricing might qualify as antitrust injury; we were quite careful to
limit our discussion in that case to *predatory* pricing.    See *ibid.* (nonpreda-
tory prices would not cause antitrust injury because they would "leave re-
spondents in the same position as would market forces").    We noted that
"[e]xcept for the alleged conspiracy to monopolize the . . . market through
predatory pricing, these alleged conspiracies could not have caused re-
spondents to suffer an 'antitrust injury.'"    *Id.*, at 586.    We also observed
that "respondents must show that the conspiracy caused them an injury for
which the antitrust laws provide relief.    That showing depends in turn on
proof that petitioners conspired to price predatorily in the American mar-
ket, since the other conduct involved in the alleged conspiracy cannot have
caused such an injury."    *Id.*, at 584, n. 7 (citations omitted); see also *id.*, at
594; *Cargill, supra*, at 117, n. 12 (interpreting our decision in *Matsushita*).
We have no occasion in the instant case to consider the proper definition of
predatory pricing, nor to determine whether our dictum in *Matsushita* that
predatory pricing might consist of "pricing below the level necessary to sell
[the offender's] products," 475 U. S., at 585, n. 8, is an accurate statement
of the law.    See n. 3, *supra*.

[11] The Court of Appeals purported to distinguish *Cargill* and *Brunswick*
on the ground that those cases turned on an "attenuated or indirect" rela-
tionship between the alleged violation—the illegal merger—and the plain-
tiffs' injury.    859 F. 2d, at 695.    We disagree.    The Court in both cases
described the injury as flowing directly from the alleged antitrust viola-
tion.    See *Cargill, supra*, at 108; *Brunswick, supra*, at 487.

*per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages under § 4 of the Clayton Act. *Per se* and rule-of-reason analysis are but two methods of determining whether a restraint is "unreasonable," *i. e.*, whether its anticompetitive effects outweigh its procompetitive effects.[12] The *per se* rule is a presumption of unreasonableness based on "business certainty and litigation efficiency." *Arizona* v. *Maricopa County Medical Society*, 457 U. S., at 344. It represents a "longstanding judgment that the prohibited practices by their nature have 'a substantial potential for impact on competition.'" *FTC* v. *Superior Court Trial Lawyers Assn.*, 493 U. S. 411, 433 (1990) (quoting *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S. 2, 16 (1984)). "Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable." *Maricopa County Medical Society, supra*, at 344.

The purpose of the antitrust injury requirement is different. It ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief. Actions *per se* unlawful under the antitrust laws may nonetheless have *some* procompetitive effects, and private parties might suffer losses

---

[12] "Both *per se* rules and the Rule of Reason are employed 'to form a judgment about the competitive significance of the restraint.'" *National Collegiate Athletic Assn.* v. *Board of Regents of University of Oklahoma*, 468 U. S. 85, 103 (1984) (quoting *National Society of Professional Engineers* v. *United States*, 435 U. S., at 692). "[W]hether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition." 468 U. S., at 104.

therefrom.[13]   See *Maricopa County Medical Society, supra,* at 351; *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 50, n. 16 (1977).   Conduct in violation of the anti-

---

[13] When a manufacturer provides a dealer an exclusive area within which to distribute a product, the manufacturer's decision to fix a maximum resale price may actually protect consumers against exploitation by the dealer acting as a local monopolist.   The manufacturer acts not out of altruism, of course, but out of a desire to increase its own sales — whereas the dealer's incentive, like that of any monopolist, is to reduce output and increase price.   If an exclusive dealership is the most efficient means of distribution, the public is not served by forcing the manufacturer to abandon this method and resort to self-distribution or competing distributors. Vertical, maximum price fixing thus may have procompetitive interbrand effects even if it is *per se* illegal because of its potential effects on dealers and consumers.   See *Albrecht* v. *Herald Co.*, 390 U. S. 145, 159 (1968) (Harlan, J., dissenting) (maximum price ceilings "do not lessen horizontal competition" but instead "drive prices toward the level that would be set by intense competition," by "prevent[ing] retailers or wholesalers from reaping monopoly or supercompetitive profits").   Indeed, we acknowledged in *Albrecht* that "[m]aximum and minimum price fixing may have different consequences in many situations."   *Id.*, at 152.   The procompetitive potential of a vertical maximum price restraint is more evident now than it was when *Albrecht* was decided, because exclusive territorial arrangements and other nonprice restrictions were unlawful *per se* in 1968. See *id.*, at 154; *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365, 375–376 (1967).   These agreements are currently subject only to rule-of-reason scrutiny, making monopolistic behavior by dealers more likely. See *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 761 (1984); *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 47–59 (1977).

Many commentators have identified procompetitive effects of vertical, maximum price fixing.   See, *e. g.*, P. Areeda & H. Hovenkamp, Antitrust Law ¶ 340.3b, p. 378, n. 24 (1988 Supp.); Blair & Harrison, Rethinking Antitrust Injury, 42 Vand. L. Rev. 1539, 1553 (1989); Blair & Schafer, Evolutionary Models of Legal Change and the *Albrecht* Rule, 32 Antitrust Bull. 989, 995–1000 (1987); Bork, The Rule of Reason and the Per Se Concept: Price Fixing and Market Division, part 2, 75 Yale L. J. 373, 464 (1966); Easterbrook, Maximum Price Fixing, 48 U. Chi. L. Rev. 886, 887– 890 (1981); Hovenkamp, Vertical Integration by the Newspaper Monopolist, 69 Iowa L. Rev. 451, 452–456 (1984); Polden, Antitrust Standing and the Rule Against Resale Price Maintenance, 37 Cleveland State L. Rev. 179, 216–217 (1989); Turner, The Durability, Relevance, and Future of American Antitrust Policy, 75 Calif. L. Rev. 797, 803–804 (1987).

trust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior. The need for this showing is at least as great under the *per se* rule as under the rule of reason. Indeed, insofar as the *per se* rule permits the prohibition of efficient practices in the name of simplicity, the need for the antitrust injury requirement is underscored. "[P]rocompetitive or efficiency-enhancing aspects of practices that nominally violate the antitrust laws may cause serious harm to individuals, but this kind of harm is the essence of competition and should play no role in the definition of antitrust damages." Page, The Scope of Liability for Antitrust Violations, 37 Stan. L. Rev. 1445, 1460 (1985). Thus, "proof of a per se violation and of antitrust injury are distinct matters that must be shown independently." P. Areeda & H. Hovenkamp, Antitrust Law ¶334.2c, p. 330 (1989 Supp.).

For this reason, we have previously recognized that even in cases involving *per se* violations, the right of action under §4 of the Clayton Act is available only to those private plaintiffs who have suffered antitrust injury. For example, in a case involving horizontal price fixing, "perhaps the paradigm of an unreasonable restraint of trade," *National Collegiate Athletic Assn.* v. *Board of Regents of University of Oklahoma,* 468 U. S. 85, 100 (1984), we observed that the plaintiffs were still required to "show that the conspiracy caused *them* an injury for which the antitrust laws provide relief." *Matsushita,* 475 U. S., at 584, n. 7 (citing *Brunswick*) (emphasis added). Similarly, in *Associated General Contractors of California, Inc.* v. *Carpenters,* 459 U. S. 519 (1983), we noted that a restraint of trade was illegal *per se* in the sense that it could "be condemned even without proof of its actual market effect," but we maintained that even if it "may have

been unlawful, it does not, of course, necessarily follow that still another party . . . is a person injured by reason of a violation of the antitrust laws within the meaning of § 4 of the Clayton Act." *Id.*, at 528–529.

## C

We decline to dilute the antitrust injury requirement here because we find that there is no need to encourage private enforcement by competitors of the rule against vertical, maximum price fixing. If such a scheme causes the anticompetitive consequences detailed in *Albrecht*, consumers and the manufacturers' own dealers may bring suit. The "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *Associated General Contractors, supra,* at 542.

Respondent's injury, moreover, is not "inextricably intertwined" with the antitrust injury that a dealer would suffer, *McCready*, 457 U. S., at 484, and thus does not militate in favor of permitting respondent to sue on behalf of petitioner's dealers. A competitor is not injured by the *anticompetitive* effects of vertical, maximum price-fixing, see *supra*, at 336–337, and does not have any incentive to vindicate the legitimate interests of a rival's dealer. See Easterbrook, The Limits of Antitrust, 63 Texas L. Rev. 1, 33–39 (1984). A competitor will not bring suit to protect the dealer against a maximum price that is set too low, inasmuch as the competitor would *benefit* from such a situation. Instead, a competitor will be motivated to bring suit only when the vertical restraint promotes interbrand competition between the competitor and the dealer subject to the restraint. See n. 13, *supra*. In short, a competitor will be injured and hence motivated to sue only when a vertical, maximum-price-fixing arrangement has a *procompetitive* impact on the market. Therefore, pro-

viding the competitor a cause of action would not protect the rights of dealers and consumers under the antitrust laws.

### III

Respondent has failed to demonstrate that it has suffered any antitrust injury. The allegation of a *per se* violation does not obviate the need to satisfy this test. The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE WHITE joins, dissenting.

The Court today purportedly defines only the contours of antitrust injury that can result from a vertical, nonpredatory, maximum-price-fixing scheme. But much, if not all, of its reasoning about what constitutes injury actionable by a competitor would apply even if the alleged conspiracy had been joined by other major oil companies doing business in California, as well as their retail outlets.[1] The Court undermines the enforceability of a substantive price-fixing violation with a flawed construction of § 4, erroneously assuming that the level of a price fixed by a § 1 conspiracy is relevant to legality and that all vertical arrangements conform to a single model.

### I

Because so much of the Court's analysis turns on its characterization of USA's cause of action, it is appropriate to

---

[1] For example, the Court reasons:

"Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *Ante*, at 340. "When prices are not predatory, any losses flowing from them cannot be said to stem from an *anticompetitive* aspect of the defendant's conduct." *Ante*, at 340–341.

begin with a more complete description of USA's theory. As the case comes to us on review of summary judgment, we assume the truth of USA's allegation that ARCO conspired with its retail dealers to fix the price of gas at specific ARCO stations that compete directly with USA stations. It is conceded that this price-fixing conspiracy is a *per se* violation of § 1 of the Sherman Act.

USA's theory can be expressed in the following hypothetical example: In a free market ARCO's advertised gas might command a price of $1 per gallon while USA's unadvertised gas might sell for a penny less, with retailers of both brands making an adequate profit. If, however, the ARCO stations reduce their price by a penny or two, they might divert enough business from USA stations to force them gradually to withdraw from the market.[2] The fixed price would be lower than the price that would obtain in a free market, but not so low as to be "predatory" in the sense that a single actor could not lawfully charge it under 15 U. S. C. § 2 or § 13a.[3]

This theory rests on the premise that the resources of the conspirators, combined and coordinated, are sufficient to sustain below-normal profits in selected localities long enough to force USA to shift its capital to markets where it can receive a normal return on its investment.[4] Thus, during the initial

---

[2] "31. Arco and its co-conspirators have engaged in limit pricing practices in which prices are deliberately set on gasoline at a level below their competitors' cost with the purpose and effect of making it impossible for plaintiff and other independents to compete. For example, Arco and its co-conspirators have sold gasoline, ex tax, at the retail pump for less than independents, such as plaintiff, can purchase gasoline at wholesale." Amended Complaint, App. 18.

[3] "27. Arco and its co-conspirators have organized a resale price maintenance scheme, as a direct result of which competition that would otherwise exist among Arco-branded dealers has been eliminated by agreement, and the retail price of Arco-branded gasoline has been fixed, stabilized and maintained at artificially low and uncompetitive levels. . . ." Amended Complaint, App. 17.

[4] It may be that ARCO could have accomplished its objectives independently, merely by reducing its own prices sufficiently to induce its retail cus-

period of competitive struggle between the conspirators and the independents, consumers will presumably benefit from artificially low prices. If the alleged campaign is successful, however—and as the case comes to us we must assume it will be—in the long run there will be less competition, or potential competition, from independents such as USA, and the character of the market will be different than if the conspiracy had never taken place. USA alleges that, in fact, the independent market already has suffered significant losses.[5]

## II

ARCO's alleged conspiracy is a naked price restraint in violation of § 1 of the Sherman Act, 15 U. S. C. § 1.[6] It is undisputed that ARCO's price-fixing arrangement, as alleged,

tomers to charge abnormally low prices and divert business from USA stations. See, e. g., Amended Complaint ¶ 30, App. 18. Such independent action by ARCO, followed by independent action by its retail customers, of course would be lawful, even if it produced the same consequences as the alleged conspiratorial program. See *United States* v. *Parke, Davis & Co.*, 362 U. S. 29, 44 (1960). Indeed, a full trial might establish that that is what happened. Nevertheless, as the case comes to us, we assume that ARCO is the architect of an illegal conspiracy.

[5] "18. For the last few years, there has been, and still is, a steady and continuous reduction in the competitive effectiveness of independent refiners and marketers selling in California and the western United States. During this time period, more than a dozen large independents have sold out, liquidated or drastically curtailed their operations, and many independent retail stations have been closed. The barriers to entry into this market have been high, and today such barriers are effectively insurmountable; once an independent is eliminated, it is highly unlikely that it will be replaced." Amended Complaint, App. 15.

[6] We have long held under the Sherman Act that "a combination for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*" *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 222–223 (1940). See also *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211, 213 (1951) (maximum resale prices); *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 761 (1984) (vertical resale prices); *Albrecht* v. *Herald Co.*, 390 U. S. 145 (1968) (vertical maximum resale prices).

is illegal *per se* under the rule against maximum price fixing, which is "'grounded on faith in price competition as a market force [and not] on a policy of low selling prices at the price of eliminating competition.' Rahl, Price Competition and the Price Fixing Rule—Preface and Perspective, 57 Nw. U. L. Rev. 137, 142 (1962)." *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 348 (1982). At issue is only whether a maximum price, administered on a host of retail stations that are ostensibly competing with one another as well as with other retailers, may be challenged by the competitor targeted by the pricing scheme.

Section 4 of the Clayton Act allows private enforcement of the antitrust laws by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U. S. C. § 15. See *Simpson* v. *Union Oil Co. of California*, 377 U. S. 13, 16 (1964) (quoting *Radovich* v. *National Football League*, 352 U. S. 445, 454 (1957)) (laws allowing private enforcement of the antitrust laws by an aggrieved party "'protect the victims of the forbidden practices as well as the public'"). In order to invoke § 4, a plaintiff must prove that it suffered an injury that (1) is "of the type the antitrust laws were intended to prevent" and (2) "flows from that which makes defendants' acts unlawful." *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 489 (1977). In *Brunswick*, the plaintiff businesses claimed that they were deprived of the benefits of the increased concentration that would have resulted had failing businesses not been acquired by petitioner, allegedly in violation of § 7. In concluding that the plaintiffs had failed to prove "antitrust injury," we found that neither condition of § 4 standing was satisfied: First, the plaintiffs sought to recover damages because the mergers had preserved businesses and competition, which is not the type of injury that the antitrust laws are designed to prevent; and second, the plaintiffs had not been harmed by any potential change in the market structure

effected by the entry of the "'deep pocket' parent." *Id.*, at 487–488.

In this case, however, both conditions of standing are met. First, § 1 is intended to forbid price-fixing conspiracies that are designed to drive competitors out of the market. See *Klor's Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207, 213 (1959) (illegal coordination "is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy"). USA alleges that ARCO's pricing scheme aims at forcing independent refiners and marketers out of business and has created "an immediate and growing probability that the independent segment of the industry will be destroyed altogether."[7]

In *Brunswick*, we recognized that requiring a competitor to show that its loss is "of the type" antitrust laws were intended to prevent

"does not necessarily mean . . . that § 4 plaintiffs must prove an actual lessening of competition in order to recover. The short-term effect of certain anticompetitive behavior—predatory below-cost pricing, for example— may be to stimulate price competition. But competitors may be able to prove antitrust injury before they actu-

---

[7] USA's Amended Complaint specifically alleges:

"39. As a direct and proximate result of the above-described combinations and conspiracy and of the acts taken in furtherance thereof:

"(a) the price of gasoline has been artificially fixed, maintained and stabilized;

"(b) independent refiners and marketers have suffered substantial losses of sales and profits and their ability to compete has been seriously impaired;

"(c) independent refiners and marketers have gone out of business or been taken over by Arco;

"(d) there is an immediate and growing probability that the independent segment of the industry will be destroyed altogether and that control of the discount market will be acquired by Arco." App. 20.

ally are driven from the market and competition is thereby lessened." 429 U. S., at 489, n. 14.

The pricing behavior in the Court's hypothetical example may cause actionable injury because it is "predatory." This is so because the Court assumes that a predatory price is illegal. The direct relationship between the illegality and the harm is what makes the competitor's short-term loss "antitrust injury." The fact that the illegality in the case before us today stems from the illegal conspiracy, rather than the predatory character of the price, does not change the analysis of "that which makes defendants' acts unlawful."[8] Thus, notwithstanding any temporary benefit to consumers, the unlawful pricing practice that is harmful in the long run to competition causes "antitrust injury" for which a competitor may seek damages.[9]

---

[8] *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 489 (1977). The analysis in *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U. S. 104 (1986), also supports this conclusion. There, the respondent alleged "antitrust injury" on alternative theories: first, that after the challenged merger petitioners' company would be able to lower its prices because it would be more efficient; and second, that it might attempt to drive respondent out of business by engaging in sustained predatory pricing. We rejected the first theory because *independent* decisions to reduce prices based on efficiencies are legal and precisely what the antitrust laws are intended to encourage. *Id.*, at 116–117. We rejected the second theory because respondent "neither raised nor proved any claim of predatory pricing before the District Court." *Id.*, at 119. However, in discussing the second theory, we recognized that predatory pricing "is a practice that harms both competitors *and* competition," and because it aims at "the elimination of competition. . . . is thus a practice 'inimical to the purposes of [the antitrust] laws,' *Brunswick*, 429 U. S., at 488, and one capable of inflicting antitrust injury." *Id.*, at 117–118 (footnote omitted). Again, a competitor suffers the same "antitrust injury" from an illegal conspiracy setting prices designed to eliminate it as it would suffer from a single firm setting predatory prices.

[9] See also Blair & Harrison, Rethinking Antitrust Injury, 42 Vand. L. Rev. 1539, 1561–1565 (1989) (unsuccessful predatory efforts cause "antitrust injury" even though consumers have not suffered).

Second, USA is directly and immediately harmed by this price-fixing scheme, that is to say, by "that which makes defendants' acts unlawful." *Id.*, at 489. In *Brunswick*, the allegedly illegal conduct at issue—the merger—itself did not harm the plaintiffs; similarly, in *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U. S. 104 (1986), the alleged injury arose not from the illegality of the proposed merger, but merely from possible postmerger behavior. Although the link between the illegal *mergers* and the alleged harms was insufficient to prove antitrust injury in either *Brunswick* or *Cargill*, both of those cases recognize that illegal *pricing practices* may cause competitors "antitrust injury."[10]

The Court accepts that, as alleged, the vertical price-fixing scheme by ARCO is *per se* illegal under § 1. Nevertheless, it denies USA standing to challenge the arrangement because it is neither a consumer nor a dealer in the vertical arrangement, but only a competitor of ARCO: The "antitrust laws were enacted for 'the protection of *competition*, not *competitors.*'" *Ante*, at 338 (quoting *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 320 (1962)). This proposition—which is often used as a test of whether a violation of law occurred—cannot be read to deny all remedial actions by com-

---

[10] I agree that not *every* loss that is causally related to an antitrust violation is "antitrust injury," *ante*, at 339, n. 8, but a scheme that prices the services of conspirators below those of competitors may cause injury for which the competitor may recover damages under § 4. In *Blue Shield of Virginia* v. *McCready*, 457 U. S. 465 (1982), the presumed injury to competitors was strong enough to support even an indirect action by a patient of the competitor. Petitioners, a medical insurance company and an organization of psychiatrists, conspired in violation of § 1 to compensate patients for the services of psychiatrists, but not those of psychologists. We recognized that if patients had chosen to go to psychiatrists, the "antitrust injury would have been borne in the first instance by the [psychologist] competitors of the conspirators." *Id.*, at 483. Instead, patient McCready went to a psychologist at her own expense. We held that "[a]lthough McCready was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on the psychologists and the psychotherapy market." *Id.*, at 483–484.

petitors. When competitors are injured by illicit agreements among their rivals rather than by the free play of market forces, the antitrust laws protect competitors precisely for the purpose of protecting competition. The Court nevertheless interprets the proposition as categorically excluding actions by a competitor who suffers when others charge "nonpredatory prices pursuant to a vertical, maximum-price-fixing scheme." *Ante,* at 331. In the context of a § 1 violation, however, the distinctions both of the price level and of the vertical nature of the conspiracy are unfounded. Each of these two analytical errors merits discussion.

## III

The Court limits its holding to cases in which the noncompetitive price is not "predatory," *ante,* at 331, 333, n. 3, 335, 339, 340, essentially assuming that any nonpredatory price set by an illegal conspiracy is lawful, see n. 1, *supra.* This is quite wrong. Unlike the prohibitions against monopolizing or underselling in violation of § 2 or § 13a, the gravamen of the price-fixing conspiracy condemned by § 1 is unrelated to the level of the administered price at any particular point in time. A price fixed by a single seller acting independently may be unlawful because it is predatory, but the reasonableness of the price set by an illegal conspiracy is wholly irrelevant to whether the conspirators' work product is illegal.

If any proposition is firmly settled in the law of antitrust, it is the rule that the reasonableness of the particular price agreed upon by defendants does not constitute a defense to a price-fixing charge.[11] In *United States* v. *Trenton Potteries*

---

[11] See *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, 398 (1927); see also *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290 (1897); *United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271, 291 (CA6 1898) ("[T]he association of the defendants, however reasonable the prices they fixed, however great the competition they had to encounter, and however great the necessity for curbing themselves by joint agreement from

*Co.*, 273 U. S. 392 (1927), the Court explained that "[t]he reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow," *id.*, at 397, and cautioned that

> "in the absence of express legislation requiring it, we should hesitate to adopt a construction making the difference between legal and illegal conduct in the field of business relations depend upon so uncertain a test as whether prices are reasonable—a determination which can be satisfactorily made only after a complete survey of our economic organization and a choice between rival philosophies." *Id.*, at 398.

See also *United States* v. *Masonite Corp.*, 316 U. S. 265, 281–282 (1942). This reasoning applies with equal force to a rule that provides conspirators with a defense if their agreed upon prices are nonpredatory, but no defense if their prices fall below the elusive line that defines predatory pricing.[12] By assuming that the level of a price is relevant to the inquiry in a § 1 conspiracy case, the Court sets sail on the "sea of doubt" that Judge Taft condemned in his classic opinion in the *Addyston Pipe & Steel* case:

> "It is true that there are some cases in which the courts, mistaking, as we conceive, the proper limits of the relaxation of the rules for determining the unreasonableness of restraints of trade, have set sail on a sea of

---

committing financial suicide by ill-advised competition, was void at common law, because in restraint of trade, and tending to a monopoly").

[12] Like the determination of a "reasonable" price, determination of what is a "predatory price" is far from certain. The Court declines to define predatory pricing for the purpose of the § 4 inquiry it creates today, *ante*, at 341, n. 10. Predatory pricing by a conspiracy, rather than a single actor, may result from more than pricing below an appropriate measure of cost. See *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 585, n. 8 (1986). See also *A. A. Poultry Farms, Inc.* v. *Rose Acre Farms, Inc.*, 881 F. 2d 1396, 1400 (CA7 1989) (describing the many considerations in a single firm case that make it difficult to infer predatory conduct from the relation of price to cost).

doubt, and have assumed the power to say, in respect to contracts which have no other purpose and no other consideration on either side than the mutual restraint of the parties, how much restraint of competition is in the public interest, and how much is not." *United States* v. *Addyston Pipe & Steel Co.*, 85 F. 271, 283–284 (CA6 1898).

## IV

The Court is also careful to limit its holding to cases involving "vertical" price-fixing agreements. In a thinly veiled circumscription of the substantive reach of § 1, the Court simply interprets "antitrust injury" under § 4 so that it excludes challenges by any competitor alleging a vertical conspiracy: "[A] vertical price-fixing scheme may facilitate predatory pricing . . . [b]ut because a firm always is able to challenge directly a rival's pricing as predatory, there is no reason to dispense with the antitrust injury requirement in an action by a competitor against a vertical agreement." *Ante*, at 339, n. 9.[13] This focus on the vertical character of the agreement is misleading because it incorrectly assumes that there is a sharp distinction between vertical and horizontal arrangements, and because it assumes that all vertical arrangements affect competition in the same way.

The characterization of ARCO's price-fixing arrangement as "vertical" does not limit its potential consequences to a neat category of injuries. A horizontal conspiracy among ARCO retailers administered by, for example, trade association executives instead of executives of their common supplier would generate exactly the same anticompetitive consequences. ARCO and its retail dealers all share an interest in excluding independents like USA from the market. The fact

---

[13] Thus, a victim of a vertical maximum-price-fixing conspiracy that is successfully driving it from the market cannot bring an action under § 1 as long as the conspirators take care to fix their prices at "nonpredatory" levels.

that each member of a group of price fixers may have made a separate, individual agreement with their common agent does not destroy the horizontal character of the agreement. We so held in the *Masonite* case:

> "[T]here can be no doubt that this is a price-fixing combination which is illegal *per se* under the Sherman Act. *United States* v. *Trenton Potteries Co.*, 273 U. S. 392 [(1927)]; *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436 [(1940)]; *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150 [(1940)]. That is true though the District Court found that, in negotiating and entering into the first agreements, each appellee, other than Masonite, acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others. . . . Prices are fixed when they are agreed upon. *United States* v. *Socony-Vacuum Oil Co.*, *supra*, p. 222. The fixing of prices by one member of a group, pursuant to express delegation, acquiescence, or understanding, is just as illegal as the fixing of prices by direct, joint action. *Id.*"[14]

Differences between vertical and horizontal agreements may support an argument that the former are more reasonable, and therefore more likely to be upheld as lawful, than the latter. But such differences provide no support for the Court's contradictory reasoning that the direct and intended consequences of one form of conspiracy do *not* constitute "antitrust injury," while precisely the same consequences of the other form *do*.

---

[14] *United States* v. *Masonite Corp.*, 316 U. S. 265, 274–276 (1942). See also *ante*, at 336, n. 6 (suggesting a horizontal component of the maximum-price-fixing arrangement in *Kiefer-Stewart*); *Business Electronics Corp.* v. *Sharp Electronics Corp.*, 485 U. S. 717, 744–748 (1988) (STEVENS, J., dissenting).

Finally, the Court's treatment of vertical maximum-price-fixing arrangements necessarily assumes that all such conspiracies have the same competitive consequences. *Ante,* at 337, 339–340, 345. The Court is again quite wrong.[15] For example, a price agreement that is ancillary to an exclusive distributorship might protect consumers from an attempt by the distributor to exploit its limited monopoly. However, a conclusion that such an agreement would not cause any antitrust injury lends no support to the Court's holding that an illegal price arrangement designed to drive a competitor out of business is immune from challenge by its intended victim.[16]

---

[15] Indeed, the Court elsewhere acknowledges that "'[m]aximum and minimum price fixing may have different consequences in many situations.'" *Ante,* at 343, n. 13 (quoting *Albrecht,* 390 U. S., at 152). This is quite true. See, *e. g., Arizona* v. *Maricopa County Medical Society,* 457 U. S. 332, 348 (1982) (the *per se* rule against maximum prices guards against the elimination of competition, discouraging entry into the market, deterring experimentation, and allowing hidden price setting); *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36, 51, n. 18 (1977) (vertical price fixing reduces interbrand and intrabrand competition and may facilitate cartelizing). In *Sylvania,* the Court also recognized that "Congress recently has expressed its approval of a *per se* analysis of vertical price restrictions by repealing those provisions of the Miller-Tydings and McGuire Acts allowing fair-trade pricing at the option of the individual States." *Ibid.* See also *White Motor Co.* v. *United States,* 372 U. S. 253, 268 (1963) (BRENNAN, J., concurring) ("Resale price maintenence is not only designed to, but almost invariably does in fact, reduce price competition not only *among* sellers of the affected product, but quite as much *between* that product and competing brands").

[16] The Court grudgingly "assume[s], *arguendo,* that *Albrecht* correctly held that vertical, maximum price fixing is subject to the *per se* rule," *ante,* at 335, n. 5, but seeks to limit that holding to "potential effects on dealers and consumers, not . . . *competitors," ante,* at 336. However, in its zeal to narrow antitrust injury, the Court assumes that all vertical maximum-price-fixing arrangements mimic the circumstances present or discussed in *Albrecht,* in which there was monopoly power at both the production and exclusive distributorship stages. This approach is incorrect. For example, in *Albrecht* itself the Court identified possible injury to consumers as one basis for its *per se* rule, even though there was *no evidence of actual* consumer injury in that case. 390 U. S., at 152–153. Furthermore, the

## V

In a conspiracy case we should always ask ourselves why the defendants have elected to act in concert rather than independently.[17] Although in certain situations collective action may actually foster competition, see, *e. g.*, *National Collegiate Athletic Assn.* v. *Board of Regents of University of Oklahoma*, 468 U. S. 85 (1984), we normally presume that the free market functions most effectively when individual entrepreneurs act independently. This is true with respect to both maximum and minimum pricing arrangements.

Professor Sullivan recognized that producers fixing maximum prices "are not acting from undiluted altruism," but

---

*Albrecht* Court did not treat Albrecht himself as a "dealer" in the conspiracy, but essentially as a "competitor" targeted by the price-fixing conspiracy between Herald Company and the new dealers that were hired "to force petitioner to conform to the advertised retail price" by selling newspapers in his territory at lower, fixed prices. *Id.*, at 149–150, and n. 6. Although Albrecht was a *potential* Herald dealer—and thus not strictly a "dealer" or a "competitor" in the Court's use of those terms—what is critical is that he had standing to bring a § 1 action as the victim of a vertical conspiracy to underprice his sales. Finally, the Court contradicts its own contrived model when it admits that vertical maximum-price-fixing schemes may facilitate predatory pricing for which a competitor could suffer "antitrust injury" in violation of § 2. *Ante*, at 339, n. 9.

[17] Until today, the Court has clearly understood why § 1 fundamentally differs from other antitrust violations:

"The reason Congress treated concerted behavior more strictly than unilateral behavior is readily appreciated. Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands. In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction. Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly." *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752, 768–769 (1984).

from self-interested goals such as prevention of new entries into the market. L. Sullivan, Law of Antitrust 211 (1977). He described the broad policy reasons to prohibit collusive pricing:

> "The policy which insists on individual decisions about price thus has at its source more than a preference for the independence of the small businessman (though that is surely there) and more than a preference for the lower prices which such a policy will usually yield to consumers (though that too is strongly present). Also at work is the theoretical conviction that the most general function of the competitive process, the allocation and realloca-tion of resources in a rational yet automatic manner, can be carried out only if independence by each trader is scrupulously required. Created out of the confluence of these parallel strivings, the policy has a breadth which makes it as forbidding to maximum price arrangements as to the more common ones which forestall price de-creases." *Id.*, at 212.

In carving out this exception to the enforcement of § 1, the Court has chosen to second-guess the wisdom of our *per se* rules and to embark on the questionable enterprise of parsing illegal conspiracies. This approach fails to heed the pru-dence urged in *United States* v. *Topco Associates, Inc.*, 405 U. S. 596 (1972):

> "The fact is that courts are of limited utility in examining difficult economic problems. Our inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector is one important reason we have formu-lated *per se* rules.
>
> "In applying these rigid rules, the Court has consist-ently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or be-cause they are allegedly developed to increase compe-

tition. *E. g., United States* v. *General Motors Corp.*, 384 U. S. 127, 146–147 (1966); *United States* v. *Masonite Corp.*, 316 U. S. 265 (1942); *Fashion Originators' Guild* v. *FTC*, 312 U. S. 457 (1941)." *Id.*, at 609–610.

The Court, in its haste to excuse illegal behavior in the name of efficiency,[18] has cast aside a century of understanding that our antitrust laws are designed to safeguard more than efficiency and consumer welfare,[19] and that private actions not only compensate the injured, but also deter wrongdoers.[20]

---

[18] See, *e. g., ante*, at 337–338, n. 7 ("Rivals cannot be excluded in the long run by a nonpredatory maximum-price scheme unless they are relatively inefficient"); *ante*, at 344 ("[I]nsofar as the *per se* rule permits the prohibition of efficient practices in the name of simplicity, the need for the antitrust injury requirement is underscored"). Firms may properly go out of business because they are inefficient; market inefficiencies may also create imperfections leading to some firms' demise. The Court sanctions a new force—the super-efficiency of an illegally combined group of firms who target their resources to drive an otherwise competitive firm out of business. Cf. Note, Below-Cost Sales and the Buying of Market Share, 42 Stan. L. Rev. 695, 741 (1990) (discussing long-term displacement of "otherwise efficient producers" by pricing to buy out a market share in a geographic area).

[19] Chief Justice Hughes regarded the Sherman Act as a "charter of freedom," *Appalachian Coals, Inc.* v. *United States*, 288 U. S. 344, 359 (1933). Judge Learned Hand recognized Congress' desire to strengthen small business concerns and to "put an end to great aggregations of capital because of the helplessness of the individual before them," *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 428–429 (CA2 1945), and we recently reaffirmed that the Sherman Act is "the Magna Carta of free enterprise," *United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 610 (1972). See also, *e. g.*, Handler, Is Antitrust's Centennial a Time for Obsequies or for Renewed Faith in its National Policy? 10 Cardozo L. Rev. 1933 (1989); Hovenkamp, Distributive Justice and the Antitrust Laws, 51 Geo. Wash. L. Rev. 1 (1982); Flynn & Ponsoldt, Legal Reasoning and the Jurisprudence of Vertical Restraints: The Limitations of Neoclassical Economic Analysis in the Resolution of Antitrust Disputes, 62 N. Y. U. L. Rev. 1125, 1137–1141 (1987) (discussing the political, social, and moral—as well as economic—goals motivating Congress in enacting antitrust legislation).

[20] See, *e. g., Simpson* v. *Union Oil Co. of California*, 377 U. S. 13 (1964); see also Polden, Antitrust Standing and the Rule Against Resale Price

As we explained in *United States* v. *American Tobacco Co.*, 221 U. S. 106, 183 (1911): "[I]t was the danger which it was deemed would arise to individual liberty and the public well-being from acts like those which this record exhibits, which led the legislative mind to conceive and to enact the Anti-trust Act." The conspiracy alleged in this complaint poses the kind of threat to individual liberty and the free market that the Sherman Act was enacted to prevent. In holding such a conspiracy immune from challenge by its intended victim, the Court is unfaithful to its history of respect for this "charter of freedom." [21]

I respectfully dissent.

---

Maintenance, 37 Clev. St. L. Rev. 179, 208–209, 220–221 (1989) (§ 4 furthers congressional objectives of deterrence and compensation by allowing private suits by injured competitors); Blair & Harrison, 42 Vand. L. Rev., at 1564–1565 (treating losses of firms that are targeted by unsuccessful predatory efforts as "antitrust injury" furthers private enforcement of antitrust laws and avoids "suboptimal levels of deterrence").

The Court of Appeals below observed that barring competitor standing leaves enforcement of the "vast majority of unlawful maximum resale price agreements" in the hands of "an unenthusiastic Department of Justice and, under certain circumstances, the dealers who are parties to the resale price maintenance agreement." 859 F. 2d 687, 694, n. 5 (CA9 1988).

[21] *Appalachian Coals, Inc.*, 288 U. S., at 359.