**INTER–COUNTY TITLE COMPANY,**
**Plaintiff,**

v.

**FIRST AMERICAN TITLE COMPANY OF NEVADA, a Nevada corporation and Founders Title Company of Nevada, a Nevada corporation; Data Trace Information Services, LLC.; a Delaware limited liability company, First American Corporation, a California corporation, Defendants.**

No. CV–N–02–0144–DWH RAM.

United States District Court,
D. Nevada.

April 17, 2003.

James M. Walsh, Esq., Walsh & Stone, Reno, NV, for Plaintiff Inter–County Title Company.

Richard J. Nelson, Esq., Theodore W. Chandler, Esq., Sidley Austin Brown & Wood LLP, San Francisco, CA, for Defendants First American Title Company of Nevada, Founders Title Company of Nevada, and Data Trace Information Services LLC.

Robert E. Lyle, Lyle & Murphy LLP, Reno, NV, for Defendants First American Title Company of Nevada And Data Trace Information Services LLC.

David R. Grundy, Lemons, Grundy & Eisenberg, Reno, NV, for Defendant Founders Title Company of Nevada.

## *ORDER*

HAGEN, District Judge.

Plaintiff sues defendants First American Title Company of Nevada, Founders Title Company of Nevada, and Data Trace Information Services LLC for restraint of trade and monopolization under Sections 1 and 2 of the Sherman Act. Before the court is defendants' motion (# 43) for summary judgment. It has been fully briefed and argued.[1]

### Introduction

For more than two decades—at considerable expense—defendants and others in the title company business in Washoe County, Nevada, have been assembling publically available data in a way that allows for its speedy and efficient retrieval. Plaintiff has recently entered defendants' market as a competitor and wants access to this data system. Defendants and the other owners are willing to sell access to plaintiff, but the parties have not agreed on price. Plaintiff now brings this antitrust suit, claiming mainly that the data system is an essential facility.

### Standard on a Motion for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of that showing lies with the moving party, *Metro Indus., Inc. v. Sammi Corp.,* 82 F.3d 839, 847 (9th Cir.1996), and for this purpose, the material lodged by that party must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Baker v. Centennial Ins. Co.,* 970 F.2d 660, 662 (9th Cir.1992). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *Lynn v. Sheet Metal Workers Int'l Ass'n,* 804 F.2d 1472, 1483 (9th Cir.1986) (quoting *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982)). A factual dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, the respondent must show by specific facts the existence of a genuine issue for trial. *Id.* at 250, 106 S.Ct. 2505.

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly

---

1. Also before the court is plaintiff's motion for preliminary injunction (# 66). Because summary judgment will be granted, the motion will be denied as moot.

probative, summary judgment may be granted.

*Id.* at 249–50, 106 S.Ct. 2505 (citations omitted). "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir. 1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Moreover, if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than otherwise would be necessary to show there is a triable issue. *Blue Ridge Ins. Co. v. Stanewich,* 142 F.3d 1145, 1149 (9th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *and California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.* 818 F.2d 1466, 1468 (9th Cir.1987)). Moreover, if the nonmoving party fails to present an adequate opposition to a motion for summary judgement, the court need not search the entire record for evidence that demonstrates the existence of a genuine issue of fact. *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029–31 (9th Cir.2001) (holding that "the district court may determine whether there is a genuine issue of fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and specifically referred to and facts therein set forth in the motion papers").

"Although we have noted a number of times in the past that '[s]ummary judgment is disfavored in antitrust cases,' such disfavor is limited to 'complex antitrust litigation where motive and intent are important, proof is largely in the hands of the alleged conspirators, and relevant information is controlled by hostile witnesses.'" *MetroNet Servs. v. U.S. West Communications,* No. 01–35406, 2003 WL 1618668, at *9 (9th Cir. Mar. 31, 2003) (citations omitted). This is not such a case.

The parties have adequately supplied the court with evidence, memoranda of law, and oral argument, and have set forth completely their legal and evidentiary positions in connection with the motion.

### The Elements of Plaintiff's Claims

By its complaint plaintiff alleges defendants have violated Sections 1 and 2 of Title 15 of the United States Code.

The elements of a Section 1 claim are "(1) an agreement, conspiracy, or combination between two or more entities; (2) an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." *American Ad Mgmt., Inc. v. GTE Corp.,* 92 F.3d 781, 788 (9th Cir. 1996). Plaintiff conceded at oral argument that it does not assert a *per se* violation. Thus, the court must "look for 'the actual effects that the challenged restraint has had on competition in a relevant market.'" *McDaniel v. Appraisal Inst.,* 117 F.3d 421, 422–23 (9th Cir.1997).

The elements of a Section 2 claim are "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

Because plaintiff seeks damages under Section 2, it must also "prove more than injury causally linked to an illegal presence in the market. [It] must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,*

429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). "To satisfy this requirement, the plaintiff must show (1) that it suffered an injury in fact, (2) that the injury was caused by an antitrust violation and (3) that the injury was of the type the antitrust laws were intended to prevent." *MetroNet Servs.*, 325 F.3d 1086, 2003 WL 1618668, at *16.

## The Facts

### I.

Plaintiff and defendant title companies are in the title insurance business in Washoe County, Nevada, which is the relevant market. This antitrust case involves a method of access to title record data employed in that business.

A real property transaction typically requires a policy of title insurance. A title insurance company examines the public real property records for all transactions affecting title to the real property involved in the transaction. The title company prepares a report from those records disclosing the transactions found and issues a policy insuring against impairments to title not disclosed in the report. The records studied in this process typically are maintained by a county recorder, using a grantor/grantee index.

A geographic title plant differs from one using a grantor-grantee index in that real property is there indexed by description rather than party name. Defendant Data Trace Informational Services LLC maintains such a plant (the "Back Plant") in Washoe County, Nevada. The Back Plant contains the Washoe County official real estate records, geographically indexed from January, 1979 forward. The plant is available to six title insurance companies doing business in Washoe County who pay monthly and other fees to maintain it. The Back Plant is owned in common by Data Trace and those title insurance com-

panies. (Aff. of Castillo (# 44), Ex. 1.) Defendant title insurance companies are two of those owners. The four other owner title companies are not parties to this case.[2] Not all title insurance companies doing business in Washoe County have purchased access to the Back Plant, although it is available to them. Plaintiff is one of those.

Plaintiff started doing title business in Nevada in 2000. It has some access to the Back Plant, but only to the extent of data posted to the plant from May, 2000 on. As will be discussed below, plaintiff has no access to the plant's earlier data because it has refused to pay for it.

### II.

There are costs associated with the establishment and maintenance of a geographic plant. In such a plant, official real property records data are posted to a computer file which must be updated on a daily basis at the expense of the owners. (Aff. of Castillo (# 44), Ex. 3.) Over time this adds up to a significant investment. (*Id.*) While no newcomer had ever asked to buy into the Back Plant, the contract between the owners anticipated the possibility. By the contract Data Trace is authorized to sell in-common proportional shares in the Back Plant to non-owner title companies for a price to be determined either by a formula tied to historical cost or the majority vote of the owners. The contract provides that the

purchase price shall be the average of the total maintenance costs paid by the [owner] title companies for the twelve (12) months prior to the sale times the number of months of the plant being sold. . . . The purchase price may be adjusted at any time by a majority of [the

---

**2.** They are Stewart, Western, First Centennial, and United Title companies.

owners] covering any respective period where they have an ownership interest. (*Id.*) As can be seen from this language, the formula tying purchase price to historical cost contains an ambiguity that invites an absurd result: a price equal to twelve times the average of the costs for the year just before the sale, multiplied by the number of months of Back Plant access to be purchased.

In early 2000, preparing to start business in Washoe County, Nevada, plaintiff engaged Washoe Micrographics to copy the official grantor/grantee index for Washoe County, a job of work Micrographics completed within six months. (Defs.' Statement of Material Undisputed Facts (# 51).) By August of 2000, plaintiff's office in Grass Valley, California, had received most of those official records and informed its underwriter that it could perform title searches using the official grantor/grantee index. (*Id.*) By this time, in order to obtain a license in Nevada to operate as a title insurance company, plaintiff had represented (on April 6, 2000) to the State of Nevada that it had purchased from Washoe County all documents and maps from that date back to 1862 and had built its own title plant for Washoe County. (*Id.*) In that filing plaintiff described its title plant as consisting of

> general name indexes from statehood to present; all maps, plats, tax and property records from statehood to present and microfiche copies of all of the above, including but not limited to a duplicate "safe storage copy" maintained off premises. Applicant will contract for on-line computerized title plant information available via Smart Title Solutions for Washoe County.

(*Id.*) No mention was made in the state license filing of any effort, intention, or need to acquire access to the Back Plant.

Plaintiff began its operations in Washoe County in mid–2000, and has operated there ever since as a full-service title company. (*Id.*) As of August, 2002, it had acquired 11% of the subdivision business in Reno. (*Id.*) By then, orders in Washoe County were "recently" up over 50 to 60%. (Dep. of Creighton (# 44).) Plaintiff plans to expand its operations in the relevant market and recently signed a five-year lease for a new branch office. (Defs.' Statement of Material Undisputed Facts (# 51).)

At his Deposition, the president and CEO of plaintiff was asked whether since May of 2002 he had added any title search staff, and he responded: "No, but if you know anybody that's looking I'd be happy to know who they are." (Dep. of Ormsby (# 44), p. 142, ll. 10–12.) The May, 2002 reference point in the question is significant because until that month plaintiff had been using the Back Plant without authorization. On May 8, 2002, the Nevada State court ordered plaintiff to surrender all Microfiche copies of it. Plaintiff claims to have complied with that order. (Dep. of Ormsby (# 44).) Thus, plaintiff's success in the relevant market persists without pre–2000 access to the Back Plant and, apparently, without adding additional title search staff.

On October 19, 2000, in response to an inquiry by plaintiff and another title insurance company about the cost of Back Plant for Washoe County from January 1, 1979, Data Trace convened a meeting of owners. (Aff. Of Castillo (# 44), Ex. 3.) In preparation for the meeting, Data Trace vice president G. Adam Castillo "prepared a chart that showed various calculations of the price for the back plant based on interpretations of the [contract] formula.... The resulting offer price using that formula, depending upon various interpretations ... resulted in prices between approximately $500,000 and $6,000,000." (*Id.*) Mr. Castillo calculated that from the inception

of the Back Plant in January, 1979 to October, 2000, maintenance fees paid by the owners, adjusted for inflation, equaled $3,819,870.36. (*Id.*) He also estimated reproduction cost of the Back Plant in an overseas location to be $1,000,000.[3] (*Id.*) At the meeting, the owners decided that a purchase price of $6,000,000 was inappropriate and instructed Mr. Castillo to examine the price issue further.[4] (*Id.*)

On April 13, 2001,[5] Mr. Castillo wrote to plaintiff that the Back Plant owners had established the following purchase price:

> The first five years purchased (at any time period) will cost $500,000. A second and third five-year period can be purchased for a discounted rate of $250,000 each. If three five year periods are purchased at a total of $1 million, the remainder of the backplant will be free of charge. If you have any questions regarding this pricing, please call me at 916 797–5005.

(*Id.*)

This was the only offer made to plaintiff. No call or letter was received by Data Trace in response. Plaintiff claims it did respond, by mail, but offers no evidence of what its response was. (Dep. of Ormsby (# 44).) In sum, if indeed plaintiff in earnest ever pursued an interest in the Back Plant, its pursuit ended here.[6] However, plaintiff has considered building its own computerized title plant for Washoe County, and its research shows the "offshore" cost to be "somewhere in the $900,000 range." (*Id.*)

## Analysis

### The Section 1 Claim

■ As has been mentioned, there was an agreement between the owners containing an erroneous formula for determining the purchase price of a proportional share in the Back Plant. To cure the extravagant multiple prompted by that formula, the owners by further agreement in April, 2001, offered to sell segments or all of the Back Plant progressively to plaintiff as follows: $500,000 for the first five years, $250,000 for a second five years, and $250,000 for the remainder of the Back Plant. (Defs.' Statement of Material Undisputed Facts (# 51).) This is not "direct or circumstantial evidence that reasonably tends to prove that [the owners] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *See Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). If anything, it is the opposite. Thus, there is no triable issue as to the "agreement" prong of the Section 1 claim.

■ As for the second element, plaintiff has conceded that the *per se* analysis does not apply. This leaves to be done the Rule of Reason inquiry under which the question is "whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan,* 522

---

**3.** At oral argument plaintiff explained that because of labor costs, reproduction of the Back Plant locally would be more costly than if done overseas.

**4.** There is no Fed.R.Civ.P. 56(e) evidence that $6,000,000 was ever stated to plaintiff as the price for access to the Back Plant.

**5.** At oral argument the court incorrectly said the date was April 21.

**6.** For a short while, plaintiff used an unauthorized copy of the Back Plant, a matter fully heard in Nevada state court and which has no relevance here.

U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). The Ninth Circuit has refined this analysis to a search for " 'the actual effects that the challenged restraint has had on competition in a relevant market.' " *McDaniel*, 117 F.3d at 422–23 (quoting *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1410 (9th Cir.1991)). Defendants offer *McDaniel* as controlling precedent requiring plaintiff to oppose their motion with more than its own injury; it must show "that competition was injured." *Id.* Plaintiff offers no evidence of injury to competition. While in its Opposition to Motion for Summary Judgment (# 54), it does assert generally that "[i]t has been compelled to turn down business," plaintiff offers no evidence of that. The affidavit of plaintiff's president and CEO (attached to the Opposition) does not mention turning away business;[7] indeed, the deposition of plaintiff's president and CEO shows that as of August, 2002 (when the deposition was taken) its business· volume and market share had been on the increase for months. (Dep. of Ormsby (# 44).)

He did state, however, that without use of the Back Plant, plaintiff is required to have two to three full time employees to support its Washoe County operation, whereas with (pre–2000)[8] access to the Back Plant, it would have needed only one such person. (Aff. of Ormsby (# 54), ¶¶ 4, 5.) He testified this extra cost has been $103,000. (*Id.*, ¶ 6.)[9]

Doubtful as the foregoing is in light of plaintiff's admission that it had not added additional search staff since it stopped using the unauthorized copy of the Back

Plant, even if one assumes it is evidence of economic loss to plaintiff, it does not show injury to competition in the relevant market. *See Atl. Richfield Co. v. USA Petroleum* Co., 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("The antitrust laws were enacted for 'the protection of *competition*, not *competitors*.' "); *McDaniel*, 117 F.3d at 423 ("[I]t was incumbent upon plaintiff to oppose [summary judgment] with evidence of 'injury to the competition in the relevant market' as an element of his Sherman Act claim. It is not enough for [plaintiff] to show that a competitor, himself, was injured . . . .") (citation omitted); *California Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 744 (9th Cir.1979) (One who redesigns his products to make them more attractive to buyers by lowering manufacturing costs and price does not violate the Sherman Act).

Summary judgment will be granted as to plaintiff's Section 1 claim.

### The Section 2 Claim

█ For. the first part of its Section 2 claim, plaintiff alleges that defendants "maintain monopoly power over title insurance products and services in the Relevant Market." (Second Am. Compl. (# 31), ¶ 35.)

"To succeed on its claim for actual monopolization under [Section] 2, [plaintiff] must prove [defendants]: (i) possessed monopoly power in the relevant markets; (ii) willfully acquired or maintained its monopoly power through exclusionary conduct; and (iii) caused antitrust injury." *Ameri-*

---

7. Nor is there any Rule 56(e) evidence from any source that plaintiff had to turn away any business for lack of Back Plant access.

8. Plaintiff has year 2000 and forward access to the Back Plant.

9. The court has not considered the affidavits of Beach and Coleman submitted with plain-

tiff's Opposition (# 54) because their use is foreclosed by Fed.R.Civ.P. 37(c)(1). Even had they have been considered, however, it would not change the outcome: Coleman's affidavit was merely cumulative of the Ormsby testimony, and neither Coleman's nor Beach's affidavit passes the test of Rule 56(e).

can *Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,* 108 F.3d 1147, 1151 (9th Cir.1997).

Monopoly power, or market power, is the power to control prices or exclude competition. *MetroNet Servs.,* 325 F.3d 1086, 2003 WL 1618668, at *11. "Market power can be proven by either direct or circumstantial evidence." *Image Technical Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir.1997).

Plaintiff has provided no direct evidence that defendants have either controlled prices or excluded competition in the relevant market. The test for circumstantial evidence requires plaintiff to " '(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and ... that existing competitors lack the capacity to increase their output in the short run.' " *Id.* (quoting *Rebel Oil, Inc. v. Atl. Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.1995)).

Plaintiff has defined the relevant market: Washoe County. While there is no evidence defendants own a dominant share of that market, there may be a triable issue whether the *owners* of the Back Plant collectively do. Plaintiff, however, has provided no Rule 56(e) evidence from which it could be inferred that the existence of the Back Plant is a significant barrier to entry into the relevant market or that existing competitors lack the capacity to increase their output in the short run. Indeed, plaintiff's market performance shows just the opposite. Therefore summary judgment will be granted on plaintiff's Section 2 monopolization claim.

For the second part of its Section 2 claim, plaintiff invokes the essential facility doctrine, alleging "[t]he title plant is an 'essential facility' for purposes of Section 2 of the Sherman Act." (Second Am. Compl., (# 31), ¶ 36.)

An essential facility is one that cannot reasonably be duplicated and is essential to competition in a given market. *Metro-Net Servs.,* 325 F.3d 1086, 2003 WL 1618668, at *18.

In support of their motion for summary judgment, defendants seem to rely on the doctrine that "[a] facility that is controlled by a single firm will be considered 'essential' only if control of the facility carries with it the power to *eliminate* competition in the downstream market." *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 544 (9th Cir.1991). While there is certainly no evidence that control of the Back Plant can eliminate competition downstream by those who have no access to it, the Back Plant is controlled by a majority of its owners, not any single firm. For this reason, *Alaska Airlines* is inapposite.

This said, the Back Plant nevertheless does not qualify as an essential facility. Duplication costs aside, plaintiff's performance in the relevant market shows unequivocally that the Back Plant is not essential to competition in that market. Therefore summary judgment will be granted on plaintiff's Section 2 essential facilities claim.

ACCORDINGLY, **IT IS ORDERED** that defendants' motion (# 43) for summary judgment is *GRANTED.* The Clerk will enter judgment accordingly.

**IT IS FURTHER ORDERED** that plaintiff's motion (# 66) for preliminary injunction is *DENIED* as moot.