IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00030-CV

 

Dan E. Roberts d/b/a ExpresTel,

                                                                      Appellant

 v.

 

Debra Whitfill 

d/b/a Total Access Communication,

                                                                      Appellee

 

 

 



From the 18th District Court

Johnson County, Texas

Trial Court No. 200100338

 



Opinion



 








          Dan Roberts and Debra Whitfill were
business partners in Cleburne.  After their partnership dissolved and they
became competitors, Whitfill sued Roberts for antitrust violations, fraud, and
breach of fiduciary duty.  Aided by a spoliation instruction, Whitfill
prevailed before a jury, which found for her on all three claims and assessed
damages of $110,000 in compensatory damages against Roberts and $50,000 in
punitive damages.  The damages were trebled, and along with attorney’s fees, a
judgment awarding over $750,000 in compensatory damages and $50,000 in punitive
damages was entered by the trial court.  We will reverse the judgment and
render judgment that Whitfill take nothing on her antitrust claim and remand
the cause to the trial court.

Background

          John Hayward, who is not a party to
this appeal, had developed telecommunications software called “Superphone” that
he was trying to market when he ran into Roberts, an old high-school friend, in
1997.  They developed a plan to create a business that would provide various
telecommunication services, including Superphone, which was a way for consumers
to save on long distance charges.  Using Superphone, a consumer in Cleburne could save money when making a long distance call—without incurring a long
distance fee—to Dallas by calling a local number and entering some codes and
the Dallas number.  Depending on the number of calls made, the consumer would
pay a monthly flat rate fee of $15 to $35, resulting in sizeable savings in
long distance charges.

          Roberts set up the business—ExpresTel—in
the summer of 1997 to sell the Superphone service (among other services).  He
obtained a physical location in Cleburne, installed a computer and other
hardware, and arranged and paid for telephone lines.  Roberts and Hayward made an oral agreement:  in exchange for allowing Roberts to use the Superphone
software and for giving Roberts a forty-year exclusivity right in the North
Texas area, Hayward was to receive fifty percent of ExpresTel’s profits. 
Roberts hired Whitfill to market ExpresTel and to provide customer service,
paying her a set-up fee for each new account she opened.  In 1999, Hayward moved to California, and his percentage of profits was renegotiated to one-third
because Roberts took over the technical troubleshooting that Hayward had
previously done.

          By 1999, Whitfill had become
dissatisfied with her ExpresTel income and began exploring options with Hayward for a separate system.  In March 2000, she obtained a lawyer, asserted that she was
Roberts’s partner instead of an ExpresTel employee, and demanded a partnership
agreement.  Roberts and Whitfill signed an Interim Standstill Agreement on
March 10, 2000, after which Whitfill had no involvement with ExpresTel’s
operations.

          Later in 2000, Whitfill sued Roberts, alleging
that they were equal partners in ExpresTel and that Roberts had breached their
partnership agreement, breached his fiduciary duty, converted property, and
defrauded her.  Hayward got involved in settlement negotiations, making two
proposals to Whitfill:  (1) she would pay Hayward $7,500 (with a payout
arrangement) to set up her own Superphone business on her computer with her own
phone lines and be charged $4.50 per customer for the use of Superphone and
Hayward’s expertise; or (2) pay Hayward $7 per customer, have her business
“hosted” through ExpresTel’s computer and phone lines, and use Hayward’s
expertise.  The second proposal would relieve Whitfill of equipment repairs and
system failures and the need to obtain and negotiate phone line prices.

          In November 2000, Roberts, Hayward,
and Whitfill settled with the following key terms:  (1) Roberts and Hayward
waived Roberts’s exclusivity for North Texas so that Whitfill could use
Superphone in the same geographical area; (2) Roberts and Whitfill released all
claims against each other; (3) Whitfill agreed to pay Roberts $22,500 for loans
made in the course of their business arrangement; (4) Whitfill would get half
(about 651) of ExpresTel’s customers and compete with ExpresTel with her own
Superphone business, Total Access, which would be hosted by ExpresTel’s
computer and phone lines; (5) Hayward would provide ExpresTel and Total Access
with Superphone software and his expertise; (6) the cost of Roberts’s phone
lines would be shared by all three equally; and (7) Hayward’s compensation would
switch from a profit percentage to a monthly per-customer fee that he would
charge Roberts and Whitfill separately.  The settlement was essentially the
second of Hayward’s two proposals.

          But about six weeks after the
settlement agreement was signed, Whitfill amended her petition, adding claims
for breach of the agreement and fraud in the inducement of the agreement.  The
parties appeared to resolve the remaining differences, and Whitfill’s suit was
dismissed with prejudice.  The parties signed a “Closing Agreement” that again
released all claims between Whitfill and Roberts.

          Whitfill began doing business as Total
Access Communication in December 2000, and Roberts continued doing business as ExpresTel. 
Except for ExpresTel’s hosting of Total Access, they were separate businesses. 
They had the same rates for customers at that time, although Roberts provided
services other than Superphone to about 150 customers.  Hayward’s own business,
HCS Telecom, leased Superphone software to ExpresTel and Total Access.  HCS
separately billed ExpresTel and Total Access each month.  Whitfill paid HCS $7.00
per customer, and Roberts ultimately paid HCS $2 per customer.  The $5
difference came from a $2.50 “hosting” fee collected from Whitfill as part of
her $7.00 charge and credited by Hayward to Roberts off of his $4.50 charge to
compensate Roberts for (1) the benefits to Hayward from Roberts’s allowing
Whitfill to use Roberts’s system (because Hayward made money from Total Access
through ExpresTel’s hosting of Total Access), and (2) Roberts’s maintaining the
system (handling the phone lines and troubleshooting).

In other words, Hayward paid Roberts a $2.50 hosting
fee so that Hayward could use Roberts’s system for Whitfill and Total Access,
but Hayward also charged Whitfill to recompense this expense.  Without the
$2.50 hosting fee, Roberts and Whitfill both would have been paying Hayward $4.50 per customer.  Whitfill would later testify that, at the time of the
settlement of the first lawsuit, she knew nothing of the $2.50 hosting fee, and
that Hayward told her she and Roberts would pay the same charge per customer. 
The difference in charges was the principal basis of her second lawsuit.

          By the early summer of 2001, Whitfill
was dissatisfied with Total Access’s revenue, so in June 2001, she severed her
relationship with Roberts and ExpresTel, setting up Total Access on the
computer and phone lines at Digitex.  Her arrangement with Hayward was
essentially the first proposal that he had made the year before:  she would pay
 Hayward $7,500 (with a payout arrangement) to set up her own Superphone
business on Digitex’s computer and phone and be charged $4.50 per customer for
the use of Superphone and Hayward’s expertise.  Hayward began billing Total
Access $4.50 per customer, instead of $7.00, because the $2.50 hosting fee
credit to Roberts was no longer justified as ExpresTel was no longer hosting
Total Access.  Whitfill was paying Digitex for that service.

          Because Whitfill was still not making
as much money as she expected in relation to ExpresTel, she became suspicious
that she was being charged more per customer than ExpresTel was.  In a May 2001
phone conversation with Hayward (which Whitfill secretly recorded), he made a
statement that she believed indicated that Hayward and Roberts had previously
agreed that she would pay $7.00 per customer; Whitfill testified that she had
not known of this agreement, nor of what Hayward was charging Roberts per
customer.  She also had been unable to open the QuickBooks (ExpresTel’s
customer billing software program) data disks that she had gotten from Roberts
in the settlement, and thus she could not ascertain the income and expense
information between ExpresTel and Hayward.

          Whitfill filed a second suit in August
2001, suing Roberts and Hayward and alleging state antitrust claims of
preferential pricing and restraint of trade under the Texas Free Enterprise and
Antitrust Act.  See Tex. Bus.
& Com. Code Ann. § 15.01 et seq. (Vernon 2002).  She also
asserted claims for breach of the settlement agreement and for fraud and breach
of fiduciary duty in negotiating the settlement.

          The suit was tried on Whitfill’s
antitrust, fraud, and breach of fiduciary duty claims.  The jury charge
included a spoliation instruction that Roberts had intentionally destroyed QuickBooks
data and the jury should presume the destroyed data was unfavorable to Roberts
concerning Whitfill’s damages, whether Roberts breached a fiduciary duty to
Whitfill, and whether Roberts contracted to unreasonably restrain trade or
commerce.

          The jury answered the following
questions pertinent to this appeal:

1.                 
Roberts and Hayward contracted to create an unreasonable restraint on trade or commerce.

 

2.                 
As a proximate result,
Whitfill suffered injury in her business or property.

 

3.                 
Roberts breached a fiduciary
duty to Whitfill.

 

4.                 
Hayward knowingly participated in Roberts’s breach of
fiduciary duty.

 

5.                 
Roberts defrauded Whitfill.

 

6.                 
Hayward defrauded Whitfill.

 

7.                 
Whitfill’s damages from Roberts’s
conduct referred to in Questions 2, 3, or 5 were $110,000.

 

8.                 
Whitfill’s damages from Hayward’s conduct referred to in Questions 2, 4, or 6 were $60,000.

 

9.                 
Whitfill’s attorney’s fees
for Roberts’s violation referred to in Question 2 were $79,000 at trial and
$30,000 for appeals.

 

10.             
Roberts’s conduct referred
to in Question 1 was willful or flagrant.

 

11.             
Hayward’s conduct referred to in Question 1 was willful
or flagrant.

 

In
a bifurcated proceeding, the jury answered the following questions:

 

16.             
Roberts’s conduct referred
to in Questions 3 or 5 was malicious.

 

17.             
Hayward’s conduct referred to in Questions 4 or 6 was
not malicious.

 

18.             
Exemplary damages should be
assessed against Roberts for his actions referred to in Question 16.

 

20.     Roberts should be assessed $50,000 in
exemplary damages.

 

The trial court entered a judgment awarding
Whitfill $758,264.19 in damages against Roberts and Hayward, jointly and
severally.  That amount was calculated by adding $170,000 in actual damages,
$79,000 in attorney’s fees, and $3,754.73 in court costs, and then trebling the
sum.  The judgment also awarded Whitfill $50,000 in exemplary damages against
Roberts.

Issues

          Roberts appeals, asserting seven
issues:

1.                 
Whitfill lacks antitrust
standing, and the trial court thus lacked subject matter jurisdiction to render
a judgment for an antitrust violation.

 

2.                 
The compensatory damages
finding against Roberts fails because it combined damages for claims of
antitrust, fraud, and breach of fiduciary duty, and because Whitfill lacks
antitrust standing, the appellate court cannot determine how much of the
compensatory damages are for fraud and breach of fiduciary duty.

 

3.                 
The evidence of lost profits
is legally insufficient.

 

4.                 
The trial court erred by
refusing to instruct the jury on the affirmative defenses of waiver and
release.

 

5.                 
If the antitrust damages
award stands, the trial court erred in awarding exemplary damages.

 

6.                 
The trial court erred in
awarding damages against Roberts jointly and severally for the damages assessed
against Hayward.

 

7.                 
The trial court erred by
giving the spoliation instruction in the charge.

 

Analysis

 

          Antitrust
Standing

 

          Roberts asserts that Whitfill lacks
antitrust standing because she did not suffer an antitrust injury and that the
trial court thus lacked subject matter jurisdiction over Whitfill’s antitrust
claim.  Whitfill responds that Roberts cannot raise antitrust standing for the
first time on appeal and that, in any event, she has antitrust standing.

          We are to construe the Texas Free
Enterprise and Antitrust Act in harmony with federal judicial interpretations
of comparable federal antitrust statutes.  Tex.
Bus. & Com. Code Ann. § 15.04.  We are also to construe the Act to
accomplish its purpose, which is “to maintain and promote economic competition
in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state.  Id.

Antitrust standing is the initial inquiry in an
antitrust case.  Maranatha Temple, Inc. v. Enterprise Products Co., 893
S.W.2d 92, 105 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (citing Jayco
Sys., Inc. v. Savin Business Machs. Corp., 777 F.2d 306, 313 (5th Cir. 1985));
Scott v. Galusha, 890 S.W.2d 945, 950 (Tex. App.—Fort Worth 1994, writ
denied) (citing Bowen v. Wohl Shoe Co., 389 F. Supp. 572, 578 (S.D. Tex.
1975)).  “The issue of standing to bring an antitrust claim is a question of
law.”  Maranatha, 893 S.W.2d at 105 (citing Eagle v. Star-Kist Foods,
Inc., 812 F.2d 538, 539 (9th Cir. 1987)).

          A two-pronged test is used to examine
whether a plaintiff has antitrust standing.  Scott, 890 S.W.2d at 950
(citing Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1448 (11th Cir. 1991)). 
First, the court should determine whether the plaintiff suffered an antitrust
injury, and second, the court should determine whether the plaintiff is an
efficient enforcer of the antitrust laws, which requires analysis of the
directness or remoteness of the plaintiff’s injury.  Id. (citing Todorov,
921 F.2d at 1449).  Without suffering antitrust injury, a plaintiff lacks
standing to sue.  Phototron Corp. v. Eastman Kodak, 842 F.2d 95, 98 (5th
Cir. 1988).

          An antitrust injury is an “injury of
the type the antitrust laws were intended to prevent and that flows from that
which makes defendants’ acts unlawful.”  Brunswick Corp. v. Pueblo
Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701
(1977) (holding that plaintiffs lacked standing because their damages resulted
from increased competition, which is what the antitrust laws were enacted to
protect, not prevent); see also Associated Gen. Contractors v. California
State Council of Carpenters, 459 U.S. 519, 539-46, 103 S.Ct. 897, 909-12, 74
L.Ed.2d 723 (1983) (holding that union lacked standing because it did not
suffer antitrust injury).  “The injury should reflect the anticompetitive
effect either of the violation or of the anticompetitive acts made possible by
the violation.”  Brunswick, 429 U.S. at 489, 97 S.Ct. at 697. 
“The antitrust laws . . . were enacted ‘for the protection of competition
not competitors.’”  Id. at 488, 97 S.Ct. at 697 (quoting Brown
Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8
L.Ed.2d 510 (1962)); see Scott, 890 S.W.2d at 950 (“Antitrust laws are
designed to protect competition rather than individual competitors.”).  Injury,
although causally related to an antitrust violation, nevertheless will not
qualify as “antitrust injury” unless it is attributable to an anticompetitive
aspect of the practice under scrutiny, “since ‘[i]t is inimical to [the
antitrust] laws to award damages’ for losses stemming from continued
competition.”  Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 109-10, 107 S.Ct. 484, 488-89, 93 L.Ed.2d 427 (1986) (quoting Brunswick, 429
 U.S. at 488, 97 S.Ct. at 697).

          The United States Supreme Court
revisited antitrust injury in a 1990 case in which USA Petroleum complained
that ARCO was engaging in antitrust practices by offering ARCO gas retailers
discounts and allowances on wholesale gas prices so those retailers could
compete more effectively with USA’s gas retailers.  Atlantic Richfield Co.
v. USA Petroleum Co., 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333
(1990).  The Court concluded that USA had not suffered an antitrust injury
because ARCO had not engaged in predatory pricing (charging prices below costs
to drive out competition), and “cutting prices in order to increase business
often is the very essence of competition.”  Id. at 337-38, 110 S.Ct. at
1891 (quoting Matsushita Elec. Industrial Corp. v. Zenith Radio Corp.,
475 U.S. 574, 594, 106 S.Ct. 1348, 1359, 89 L.Ed.2d 538 (1986)).  The Court
reiterated the difference between a violation of the antitrust laws and whether
a particular plaintiff has suffered an antitrust injury as a result of that
violation, including per se violations.  Id. at 338-44, 110 S.Ct.
at 1891-94.  “The antitrust injury requirement ensures that a plaintiff can
recover only if the loss stems from a competition-reducing aspect or effect of
the defendant’s behavior. . . .  “[P]rocompetitive or efficiency-enhancing
aspects of practices that nominally violate the antitrust laws may cause
serious harm to individuals, but this kind of harm is the essence of
competition and should play no role in the definition of antitrust damages.”  Id. at 343, 110 S.Ct. at 1894 (quoting Page, The Scope of Liability for Antitrust
Violations, 37 Stan. L. Rev.
1445, 1460 (1985)).

          Whether antitrust standing, a specific
type of standing, can be raised for the first time on appeal is an issue of
first impression.  We see no reason to differentiate it from standing in
general, which may be raised for the first time on appeal.[1] 
It would be anomalous to allow a challenge to a plaintiff’s standing to assert,
for example, a constitutional claim for the first time on appeal, but not to
allow a challenge to a plaintiff’s standing to assert an antitrust claim. 
While it may be a better practice to first raise antitrust standing (and any
other standing challenge) in the trial court, we hold that a challenge to a
plaintiff’s antitrust standing may be made for the first time on appeal.

We next address whether Whitfill suffered an
antitrust injury.  “It is a well-established rule that a plaintiff does not
have antitrust standing to prosecute an economic injury to himself unless that
injury corresponds to an injury of the same type to the relevant market.”  Scott,
890 S.W.2d at 950 (citing Anago, Inc. v. Tecnol Medical Prod., Inc., 976
F.2d 248, 249 (5th Cir. 1992)).  Whitfill pled that Roberts and Hayward had secretly agreed that Whitfill would be charged more per customer than
Roberts.  She alleged that this agreement significantly restrains trade because
it provides preferential pricing to Roberts.  She further alleged that it
suppresses and destroys competition and has the effect of increasing prices. 
In her pleading, Whitfill asserted that the alleged agreement between Roberts
and Hayward had the anticompetitive effects of (1) providing an unfair pricing
advantage that prevents her from competing with Roberts and (2) depriving
consumers of the benefits of competition in the long distance market.  She
further pled that she had lost customers to Roberts because he had offered them
price incentives that she could not match due to the higher price that Hayward was charging her.

But the record is devoid of evidence on how the
alleged misconduct and injuries correspond to an injury to consumers and
competition in the relevant market.  Whitfill testified that her only
competition was ExpresTel, except in Tarrant and Dallas Counties.  Only one
other company did anything similar to Superphone, and at the time of trial, the
market was slowing.  Hayward testified that of the other two or three
businesses in the Cleburne area offering similar service, none had software
like Superphone.  Digitex provided Superphone service for 50 to 100 customers
in Whitney, and there was a competitor in Arlington.  An ExpresTel employee
testified that it had recently lost “quite a few” customers to Valor, another
competitor.

          Whitfill did not suffer an antitrust
injury.  She and Roberts, her alleged former partner, had a dispute, and when
they divided their business, she did not make as much money as she expected because
she paid the $2.50 hosting fee that was credited to Roberts for providing the
hosting.  See Atlantic Richfield, 495 U.S. at 338, 110 S.Ct. at 1891
(quoting Cargill, 479 U.S. at 116, 107 S.Ct. at 492 (“To hold that the
antitrust laws protect competitors from the loss of profits due to
[nonpredatory] price competition would, in effect, render illegal any decision
by a firm to cut prices in order to increase market share.”)).  Irrespective of
the merit of her fraud and breach of fiduciary duty claims, Whitfill’s alleged
injury is not an antitrust injury.  See Scott, 890 S.W.2d at 950
(physician complaining of alleged antitrust conspiracy to exclude him from medical
staff did not suffer antitrust injury); see also Walker v.
U-Haul Co. of Miss., 734 F.2d 1068 (5th Cir. 1984) (plaintiff lacked
standing because no antitrust injury shown but could maintain fraud and breach
of fiduciary duty claims), op. on reh’g, 747 F.2d 1011 (5th Cir. 1984).

          Because Whitfill did not suffer an
antitrust injury, she does not have antitrust standing, and the trial court
lacked subject matter jurisdiction over her antitrust claim.  We sustain Roberts’s
first issue, reverse the award of compensatory damages in the judgment (because
it is premised on trebling of actual damages, costs, and attorney’s fees), and
render judgment that Whitfill take nothing on her antitrust claim.

          Compensatory Damages

          In his second issue, Roberts asserts
that because Whitfill lacks antitrust standing and because the trial court
erred in the way it submitted Question 7, the compensatory damages award in the
judgment must be set aside and reversed and the cause remanded for a new trial
on Whitfill’s fraud and breach of fiduciary duty claims.

          Dena Day, Whitfill’s damages expert,
calculated her actual damages to be $168,663.32.  The jury answered one
compensatory damages question (7) as to Roberts and one compensatory damages
question (8) as to Hayward.  Question 7 asked the jury to determine Whitfill’s
damages, if any “that resulted from the conduct of Roberts, if any, as found by
you in Questions 2 [antitrust], 3 [breach of fiduciary duty] or 5
[fraud].” (Emphasis added).  The jury was instructed to include an allowance
for lost profits in considering damages arising from the antitrust claim and
not to include an allowance for lost profits in considering damages arising
from the breach of fiduciary duty and fraud claims.  Instructions from the
Texas Pattern Jury Charges on damages for fraud and breach of fiduciary duty
were not used.  The jury answered $110,000 in Question 7 and $60,000 in
Question 8, the identical damages question as to Hayward’s conduct.

          In response to Whitfill’s assertion
that Roberts failed to preserve his complaint by not sufficiently and
specifically objecting, we find that Roberts adequately objected to Question
7.  See Dallas Mkt. Ctr. Dev. Co. v. Liedeker, 958 S.W.2d 382, 387 (Tex. 1997), overruled in part on other grounds by Torrington
Co. v. Stutzman, 46 S.W.3d 829 (Tex. 2000); State Dep’t Hwys.
& Pub. Transp. v. Payne,
838 S.W.2d 235, 239-41 (Tex. 1992).  Roberts did object, stating that there
should be separate damage questions for the antitrust claim and for the fraud
and breach of fiduciary duty claim because lost profits were recoverable only
on the antitrust claim and other damages might be recoverable under any of the
three claims.  

In the charge, the trial court specifically
instructed the jury not to consider lost profits as a damages element for fraud
and breach of fiduciary duty, but only for the antitrust claim.  The jury was
also instructed not to reduce damages by the amount of damages found separately
against the other defendant.  The jury found that $110,000 in damages resulted
from Roberts’s conduct and that $60,000 resulted from Hayward’s conduct, for a
total of $170,000, which closely approximates Day’s damage calculation of
$168,663.32.  Day’s calculation was broken down into fourteen categories
(several of which were for “lost revenue”), and we agree with Roberts that the
jury’s answers of $110,000 and $60,000 cannot be explained (Whitfill offers no
explanation).

More importantly, we cannot determine whether
the jury awarded all or part of the $110,000 against Roberts as lost profits on
the antitrust claim.  Some of it plainly was, as Day’s calculations included
“lost revenue,” and at the charge conference, in response to Roberts’s
counsel’s objection to Question 7, Whitfill’s counsel admitted that Day’s
damages calculation included lost profits.  We therefore necessarily cannot
determine a specific amount of compensatory damages against Roberts on
Whitfill’s fraud and breach of fiduciary duty claims.

When a damages question mixes valid and invalid
elements of damages in a single, broad-form submission and the defendant
adequately and correctly objected, harmful error occurs because the appellate
court cannot determine whether the jury based its verdict on an invalid or
improperly submitted damage element.  Harris County v. Smith, 96
S.W.3d 230, 234 (Tex. 2002); Tex. R.
App. P. 61.1(b); see also Crown Life Ins. Co. v. Casteel, 22
S.W.3d 378, 388 (Tex. 2000) (finding harmful error where single liability
question mixed valid and invalid theories of recovery and defendant properly
objected).  The trial court erred in overruling Roberts’s objection to Question
7, and that error is harmful because in this appeal we are prevented from
“unmixing” the compensatory damages and determining the amount of compensatory
damages against Roberts on Whitfill’s fraud and breach of fiduciary duty
claims.

We sustain Roberts’s second issue and reverse
the judgment’s award of compensatory damages as to Roberts and remand the cause
for a new trial on Whitfill’s fraud and breach of fiduciary duty claims. 
Furthermore, the judgment award of $50,000 in exemplary damages against Roberts
must be reversed because exemplary damages are not recoverable without
compensatory damages.  See Tex.
Civ. Prac. & Rem. Code Ann. § 41.004(a) (Vernon Supp. 2005)
(“exemplary damages may be awarded only if damages other than nominal damages
are awarded); Juliette Fowler Homes v. Welch Assocs., 793 S.W.2d 660,
667 (Tex. 1990) (“Recovery of actual damages is a prerequisite to the receipt
of exemplary damages.”).

Because of our disposition, we need not address
issues 3, 5, and 6, but we will address issues 4 and 7, which will likely arise
in a retrial of this cause.  See Edinburg Hosp. Auth. v. Trevino, 941
S.W.3d 76, 81 (Tex. 1997); In re J.B., 93 S.W.3d 609, 617 (Tex.
App.—Waco 2002, pet. denied).

Submission of Affirmative Defenses of Waiver and
Release

Issue 4 complains of the trial court’s refusal
to submit a question on Roberts’s affirmative defenses of release and waiver,
which he pled.  We review a trial court’s decision to submit or refuse a
particular question or instruction under an abuse-of-discretion standard.  Texas
Dep’t of Human Services v. E.B., 802 S.W.2d 647, 649 (Tex. 1990); Byrd
v. Estate of Nelms, 154 S.W.3d 149, 160 (Tex. App.—Waco 2004, pet. denied). 
A trial court is required to submit questions and instructions that are raised
by the pleadings and evidence.  Tex. R.
Civ. P. 278.  The trial court has broad discretion in submitting jury
questions and instructions.  Plainsman Trading Co. v. Crews, 898 S.W.2d
786, 791 (Tex. 1995).  “Failure to submit a question shall not be deemed a
ground for reversal of the judgment unless a substantially correct question has
been requested in writing and tendered by the party complaining of the
judgment.”[2]  Tex. R. Civ. P. 278.  When a trial court
refuses to submit a proper question or instruction, reversal is not required
unless the error probably caused the rendition of an improper judgment.  See
Tex. R. App. P. 44.1; Union Pac.
R.R. Co. v. Williams, 85 S.W.3d 162, 170 (Tex. 2002).

Roberts’s release and waiver defenses were based
on the settlement agreement and the closing agreement in connection with the
first lawsuit.  Each agreement had identical release language:  Whitfill “release[d]
and forever discharge[d] [Roberts] . . . of and from all claims,  . . . causes
of action, . . . and liabilities whatsoever . . . which she ever had, now has,
or which she hereafter can, shall or may have against [Roberts], for or by
reason of any matter, cause or thing whatsoever occurring prior to the date of
this instrument. . . .”  On appeal, the parties vigorously dispute the evidence
that Whitfill knew or suspected that Roberts was defrauding her (by the alleged
secret agreement that she would be charged more by Hayward) when she signed the
two agreements.  This disputed evidence not only raised the defenses of release
and waiver, but it demonstrates a fact issue exists that a jury should
determine.  The trial court erred in refusing to submit Roberts’s question.  

Spoliation Instruction

          In discovery, Whitfill had requested
that Roberts produce the original and any copies of ExpresTel’s QuickBooks data
for January 1, 2000 through November 29, 2001, and when he did not produce the
data at his deposition, Whitfill filed a motion to compel and for sanctions,
which the trial court heard in September 2002.  

At the hearing, an ExpresTel employee testified
that ExpresTel’s QuickBooks program had “crashed” the year before and that only
ExpresTel customer data was reentered; no Total Access customer data was
reentered.  Roberts testified that he had started removing QuickBooks data
about Total Access customers in November 2001, a few months after Whitfill
filed the present lawsuit and just after he had been served with a subpoena
duces tecum requesting the QuickBooks data.  Roberts had supplied QuickBooks
data twice in the first lawsuit, he had a paper copy of customer names, and he
explained that he could print specific reports from QuickBooks such as accounts
receivables, sales reports, customer invoices, “a multitude of things.”  He
also said that printing his current QuickBooks data would include ExpresTel’s
new customers, which Roberts did not want to produce.

The hearing recessed without a ruling and was
never resumed.  The trial court never ordered Roberts to produce the QuickBooks
data.  Based on Roberts’s testimony that he deleted Total Access customer data
after being served with the subpoena duces tecum, the trial court, over
Roberts’s objection, included the following spoliation instruction, which
Whitfill’s attorney strongly emphasized in closing argument:

You are instructed that Dan Roberts has
intentionally destroyed QuickBooks data.  You are further instructed that you
should presume that the QuickBooks data destroyed was unfavorable to Dan
Roberts concerning the damages suffered by Whitfill.  You are further
instructed that you should presume that the QuickBooks data destroyed was
unfavorable to Dan Roberts concerning whether he breached a fiduciary duty owed
to Whitfill.  You are further instructed that you should presume that the QuickBooks
data destroyed was unfavorable to Dan Roberts concerning whether he contracted
to unreasonably restrain trade or commerce.  You are further instructed that
Dan Roberts bears the burden to disprove these presumptions.

 

Roberts asserts in issue 7 that the trial court
committed harmful error in giving the spoliation instruction.  Because we are
already reversing the judgment and remanding this cause, and because the record
on this issue is not fully developed, we will not rule on it.  But we will discuss
the spoliation instruction to guide the trial court and the parties on remand,
beginning with the Texas Supreme Court’s most recent spoliation discussion:

Evidence may be unavailable for discovery and
trial for a variety of reasons.  Evidence may be lost, altered or destroyed
willfully and in bad faith or it may be lost for reasons completely innocent. 
Sometimes, lost evidence may be easily replicated, or it may be so marginal
that it has little or no effect on the outcome of the case.  On other
occasions, the loss or destruction of evidence may seriously impair a party’s
ability to present its case.  A trial judge should have discretion to fashion
an appropriate remedy to restore the parties to a rough approximation of their
positions if all evidence were available.  These remedies must generally be
fashioned on a case-by-case basis.

. . . 

Our courts of appeals have generally limited the
use of the spoliation instruction to two circumstances:  [1] the deliberate
destruction of relevant evidence and [2] the failure of a party to produce
relevant evidence or to explain its non-production.  Under the first
circumstance, a party who has deliberately destroyed evidence is presumed to
have done so because the evidence was unfavorable to its case.  Under the
second, the presumption arises because the party controlling the missing
evidence cannot explain its failure to produce it.

. . .

Before any failure to produce material evidence
may be viewed as discovery abuse, the opposing party must establish that the
non-producing party had a duty to preserve the evidence in question.  Such a
duty arises only when a party knows or reasonably should know that there is a
substantial chance that a claim will be filed and that evidence in its
possession or control will be material and relevant to that claim.   

 

Wal-Mart
Stores, Inc. v. Johnson, 106
S.W.3d 718, 721-22 (Tex. 2003) (citations omitted).

 

          In this case, while we do not decide
whether a spoliation instruction was proper, we note several concerns.  First,
Whitfill did not pursue her motion to compel and obtain an order requiring
Roberts to produce whatever ExpresTel QuickBooks data existed.[3] 
We thus express some doubt about the materiality and relevance of that data overall
and whether the deleted data—Total Access’s customer data—seriously impaired
Whitfill’s ability to present her case.  Because of the comprehensive severity of
the spoliation instruction, Whitfill’s failure to pursue the ExpresTel QuickBooks
data gives us pause.  Connected to that concern is the absence of an
explanation of the materiality and relevance of the data and how or even if its
absence seriously impaired Whitfill’s ability to present her case.  Furthermore,
Roberts provided an explanation for the data’s removal from his computer and
offered to produce at least some of the data in paper form and explained how he
could print specific reports.  Finally, based on the above circumstances
surrounding the data at issue and a review of spoliation instructions recently
approved by Texas courts,[4]
the comprehensive severity of the spoliation instruction that was given in this
case appears excessive.  Based on the limited record before us, a less severe
spoliation instruction would appear appropriate if the proper predicate is laid. 
See Trevino, 969 S.W.2d at 960-61 (Baker, J., concurring) (discussing the
two spoliation presumptions—severe and less severe—and their application).

Conclusion

            We reverse the trial court’s
judgment, render judgment that Whitfill take nothing on her antitrust claim,
and remand the cause to the trial court for proceedings consistent with this
opinion.

 

BILL VANCE

Justice

 

Before
Chief Justice Gray,

Justice Vance, and

Justice Reyna

(Chief Justice Gray concurs in only the judgment
of the Court without a separate opinion.)

Reversed
and rendered in part; cause remanded

Opinion
delivered and filed March 22, 2006

[CV06]









    [1]       Standing
is a component of subject matter jurisdiction.  Texas Ass’n of Bus.
v. Texas Air Control Bd., 852 S.W.2d 440, 445-46 (Tex. 1993).  A party has
standing if it has a justiciable interest in the suit or a personal stake in
the controversy.  See Nootsie, Ltd. v. Williamson County Appraisal Dist., 925
S.W.2d 659, 661 (Tex. 1996); Tex. Ass’n of Bus., 852 S.W.2d at
444.  Without
standing, a court lacks subject matter jurisdiction to hear the case; thus, standing
may be raised for the first time on appeal.  Austin Nursing
Center, Inc. v. Lovato, 171 S.W.3d 845, 849 (Tex. 2005) (citing Tex.
Ass’n of Bus., 852 S.W.2d at 443, 445).





    [2]       Roberts
submitted the following question and instructions:

 

Do you find that Debra Whitfill waived and/or
released Dan E. Roberts from her claim of fraud in the inducement and breach of
fiduciary duty?

 

Release is a contractual surrender by one party
of its cause of action against the other party.  A release extinguishes a claim
or cause of action and bars recovery on the released claim.

 

Waiver is an intentional surrender of a known
right or intentional conduct inconsistent with claiming the right.

 

A release and a waiver are not valid if either
is procured by fraud.

 

Fraud occurs when --

a.                  
a party makes a material
misrepresentation,

b.                  
the misrepresentation is
made with knowledge of its falsity or made recklessly without any knowledge of
the truth and as a positive assertion,

c.                  
the misrepresentation is
made with the intention that it should be acted on by the other party, and

d.                  
the other party acts in
reliance on the misrepresentation and thereby suffers injury.

 

Answer:_____________

 

This question, which includes Whitfill’s matter
of avoidance (fraud in the inducement), is substantially correct.  See,
e.g., Lemaire v. Davis, 79 S.W.3d 592, 596-97 (Tex. App.—Amarillo 2002,
pet. denied) (trial court submitted defense of release with instruction that
fraud invalidated release).





    [3]       The
failure to pursue the motion to compel to a ruling raises the issue whether a
sanction such as a spoliation instruction was warranted; “the failure to obtain
a pretrial ruling on discovery disputes that exist before commencement of trial
constitutes a waiver of any claim for sanctions based on that conduct.”  Remington
Arms Co. v. Caldwell, 850 S.W.2d 167, 170 (Tex. 1993); see generally
Trevino v. Ortega, 969 S.W.2d 950, 958-61 (Tex. 1998) (Baker, J.,
concurring) (discussing various sanctions for evidence spoliation, including
giving jury spoliation instruction).  "If neither party asks for a
hearing [on the objections], the party who sent the request for discovery
waives the requested discovery.”  Michol O’Connor, O’Connor’s Texas Rules * Civil Trials 341 (Michol O’Connor
& Byron P. Davis eds., 2005).

 





    [4]       The
following spoliation instructions were approved:

 

You are instructed that if
there is evidence that is pertinent to the issues in this cause, which was in
the exclusive possession and control of a party and which cannot be produced,
and its disappearance or non-production has not been satisfactorily explained,
then you may consider that such evidence contained information adverse to the
position taken by the party who was in the possession.

 

Texas Elec.
Cooperative v. Dillard, 171 S.W.3d 201, 208 (Tex. App.—Tyler 2005, no
pet. h.)

You are instructed that, when a
party has possession of a piece of evidence at a time he knows or should have
known it will be evidence in a controversy, and thereafter he disposes of it,
alters it, makes it unavailable, or fails to produce it, there is a presumption
in law that the piece of evidence, had it been produced, would have been unfavorable
to the party who did not produce it.  If you find by a preponderance of the
evidence that Cresthaven Nursing Residence had possession of original,
unaltered nurses notes pertaining to Wanda Granger at a time it knew or should
have known they would be evidence in this controversy, then there is a
presumption that the original, unaltered nurses notes pertaining to Wanda
Granger, if produced, would be unfavorable to Cresthaven Nursing Residence. 
This presumption may be rebutted by Cresthaven Nursing Residence with the
evidence of a reasonable explanation for the non-production of the evidence.

 

Cresthaven
Nursing Residence v. Freeman, 134 S.W.3d 214, 225 (Tex. App.—Amarillo 2003, no
pet.).